PRESENT: All the Justices

ROBERT STACY YARBROUGH

v.  Record No. 021660   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                        March 3, 2005
WARDEN OF THE SUSSEX I STATE PRISON


              UPON A PETITION FOR A WRIT OF HABEAS CORPUS

     This petition for a writ of habeas corpus was filed under

our original jurisdiction.  We consider whether the petitioner

was denied his Sixth Amendment right to the effective assistance

of counsel in a second penalty phase proceeding conducted after

we remanded his capital murder case.

                          I. PROCEEDINGS

     The petitioner, Robert Stacy Yarbrough, was convicted in a

jury trial in the Circuit Court of Mecklenburg County (the

circuit court) of the capital murder of Cyril Hugh Hamby during

the commission of robbery, in violation of Code § 18.2-31(4),

and of the robbery of Hamby, in violation of Code § 18.2-58.

The jury found Yarbrough guilty of both crimes, and fixed his

punishment at death for the capital murder and at life

imprisonment for the robbery.  The circuit court sentenced

Yarbrough in accordance with the jury verdict.

     We affirmed Yarbrough's robbery conviction and sentence,

and his conviction of capital murder, but vacated the death

sentence and remanded the case for a new penalty phase

proceeding because the circuit court had refused Yarbrough's request to instruct the jury that he would be ineligible for parole if he received a sentence of life imprisonment. Yarbrough v. Commonwealth, 258 Va. 347, 374-75, 519 S.E.2d 602, 616-17 (1999)(Yarbrough I).  On remand, a jury again fixed Yarbrough's punishment for capital murder at death, and the circuit court sentenced Yarbrough in accordance with the jury verdict.  We affirmed the circuit court's judgment.  Yarbrough v. Commonwealth, 262 Va. 388, 551 S.E.2d 306 (2001)(Yarbrough II), cert. denied, 535 U.S. 1060 (2002).

Yarbrough filed a petition for a writ of habeas corpus under Code § 8.01-654 against the warden of the Sussex I State Prison (the warden).  Based on the death sentence he received on remand, Yarbrough alleged that (1) the jury was selected in a racially discriminatory manner; (2) the jury was misled about the appropriate burden of proof; (3) his trial counsel rendered ineffective assistance; and (4) Virginia's capital murder statute is unconstitutional.  We refused Yarbrough's petition.

Yarbrough filed a petition for rehearing pursuant to Rule 5:39, which we granted limited to consideration of the claim that Yarbrough was denied the effective assistance of counsel at his second penalty phase proceeding.  We entered an order directing the circuit court to conduct an evidentiary hearing pursuant to Code § 8.01-654(C) to consider the merits of

Yarbrough's allegation that he was denied the effective assistance of counsel at his penalty phase proceeding on remand because counsel unreasonably failed to investigate and present relevant mitigating evidence as required by the United States Supreme Court's decision in Wiggins v. Smith, 539 U.S. 510 (2003).  The circuit court conducted an evidentiary hearing (the habeas hearing) and submitted a written report that contained findings of fact and conclusions of law as directed by Code § 8.01–654(C)(3).[1]

## II. FACTS

In Yarbrough I, we provided a complete statement of facts concerning the crimes for which Yarbrough was convicted and sentenced.  258 Va. at 353-55, 519 S.E.2d at 603-05.  In Yarbrough II, we described the evidence presented at the second penalty phase proceeding, which is relevant to the present habeas corpus proceeding.  262 Va. at 391-92, 551 S.E.2d at 307-08.  We will recite the facts from that opinion:

> During the second penalty phase proceeding, the Commonwealth presented essentially the same evidence it had presented during the first penalty phase proceeding, including evidence that the defendant killed Hamby by stabbing him multiple times in the neck.  The Commonwealth's evidence also included testimony from Hamby's family and friends concerning

---

[1] The Honorable Charles L. McCormick, III (retired) conducted the evidentiary hearing and submitted the required report to this Court.  Judge McCormick also presided over Yarbrough's original guilt and penalty phase proceedings, as well as the second penalty phase proceeding on remand.

3

the impact of Hamby's murder on them.  Hamby's two daughters, his daughter-in-law, and one of his granddaughters testified that their relationships with Hamby were close and were nurtured by his kindness and thoughtfulness, and that Hamby's death has devastated their family.  Two former neighbors and long-time customers of Hamby testified that Hamby had developed close friendships with them that demonstrated his warmth and generosity.

The Commonwealth also presented testimony from Dr. Marcella F. Fierro, the Chief Medical Examiner for the Commonwealth.  Dr. Fierro testified that Hamby bled to death as a result of at least ten separate knife wounds to his neck.  She testified that the wounds penetrated to the junction between the neck and skull at several locations on the rear of Hamby's neck, and that such wounds "are usually associated with trying to take the head off."  In addition, Dr. Fierro identified injuries from at least five separate blows to Hamby's head that were consistent with beating and kicking.  She testified that Hamby was alive when all these wounds were inflicted, and that it took as long as 15 minutes for him to bleed to death.  The Commonwealth presented additional testimony from Dominic Rainey, a witness to the killing, who testified that Hamby was begging the defendant to stop attacking him while the defendant was cutting the front and rear of Hamby's neck in a "sawing motion."

Yarbrough presented testimony from his mother who stated that Yarbrough had lived with her his entire life except for two years as a teenager during which he lived with his grandmother.  Yarbrough also presented testimony from his former prison counselor who testified that Yarbrough had not received any adverse disciplinary reports during his time in prison.

Id.

At the habeas hearing, Yarbrough's trial counsel, Buddy Ward, testified that he and his investigator, William Smith, conducted a "deep background check" that began with Yarbrough's

birth.  They collected Yarbrough's school records and investigated a medical incident from Yarbrough's childhood.

Ward and Smith interviewed Yarbrough at length, and contacted Yarbrough's family members and other potential character witnesses.  According to Ward, Yarbrough did not say anything negative about his mother, and did not indicate that he had been neglected during his childhood years.

The only two family members with whom Ward spoke were Yarbrough's mother and grandmother.  Yarbrough's mother stated that at one point, she sent her son to live with his grandmother in order to "work through" her own problems with drugs. Yarbrough's grandmother, however, did not offer any information suggesting that Yarbrough had experienced a troubled childhood. Ward did not interview Yarbrough's father or sister because Yarbrough stated that he had not had contact with them in many years.

Ward also stated that he discussed Yarbrough's case with Dr. Evan Nelson, a psychologist appointed by the circuit court who interviewed Yarbrough and his family members.  Dr. Nelson informed Ward that Yarbrough's mother had a drug problem when Yarbrough was a child and once placed Yarbrough in the care of his grandmother for this reason.

After receiving Dr. Nelson's evaluation, Ward attempted to "follow up" with Yarbrough's mother and grandmother, but

received no new information and did not "push" for more information about Yarbrough's childhood or about his mother's drug use. Ward also stated that he did not use Dr. Nelson as a witness at the second penalty phase proceeding because Dr. Nelson had concluded that his testimony could prove harmful to Yarbrough's case.

Yarbrough's mother, Lorraine R. Mitchell, testified extensively about Yarbrough's childhood years and about her struggle with drug abuse. She stated that Yarbrough spent his early childhood years with her in a low-income housing project in Camden, New Jersey. Her boyfriend, Willis Jenkins, and their daughter, Dorian, also lived there for a number of years.

Mitchell stated that when Jenkins brought crack cocaine into the home, she started using the drug and became addicted to it. Jenkins eventually moved out of the home because of her addiction. After Jenkins left, Mitchell did not pay her bills regularly, and her utility services often were disconnected. She eventually lost her home after failing to make the mortgage payments.

Mitchell testified that the rest of Yarbrough's childhood was spent in several different locations. She and the two children lived for a period of time at her mother's house and, when Yarbrough was 11 years old, he spent a year in Illinois

with his half brother.  While Yarbrough was in Illinois, Jenkins removed Dorian permanently from Mitchell's care.

Mitchell stated that after Yarbrough returned from Illinois, they lived in a shelter and in an apartment she described as a "slum."  She and Yarbrough later moved to Virginia's Eastern Shore.  They eventually began living with a man named Willie Jiggets, who sold crack cocaine and whose home was a place where neighbors would "hang out," play cards, and drink liquor.

Mitchell testified that despite her drug use and living conditions, she tried not to use illegal drugs in front of her children, and that Yarbrough was never physically or sexually abused.  Mitchell also testified that her children always had food, clothing, and a place to live.  Mitchell stated that she answered all the questions Ward and Smith asked, and that she thought she had discussed her drug use with Ward.

Yarbrough's grandmother, Annie Mae Riley, testified that neither Ward nor Smith requested details about Yarbrough's personal history.  However, Riley stated that she was present when Smith asked Mitchell some questions about her use of crack cocaine.

Riley also testified that Yarbrough lived with her while he was attending kindergarten and first grade.  When Yarbrough and

Mitchell moved to their own house in Camden, Riley visited them regularly.

During this time, Riley observed a change in Mitchell's behavior and a deterioration of conditions in the home. However, Riley stated that the children always had food to eat. Riley also testified that Yarbrough often cared for Dorian when Mitchell failed to do so.

When Mitchell confessed her drug addiction to Riley, Riley helped Mitchell obtain assistance to deal with the problem and later helped her move to Virginia. Riley further stated that Yarbrough was not abused or neglected as a child.

Yarbrough also presented the testimony of Willis Jenkins, who confirmed many of the details of Mitchell's testimony and testified that neither Ward nor Smith contacted him about Yarbrough. Jenkins also stated that he introduced Mitchell to the use of crack cocaine, and that she began using it on a daily basis. He testified that even after he stopped using the drug, Mitchell continued taking it and frequently had a "house full of people getting high" in the basement while the children were upstairs. Jenkins also stated that during this period Mitchell took money from his bank account to buy drugs and often did not pay their utility bills, which resulted in disruptions in service.

Jenkins testified that he never witnessed any abuse of the children, and that he and Mitchell tried to shield the children from their drug use. He eventually moved out of the house and removed Dorian from Mitchell's care one or two years later.

Jenkins also stated that during the period when Mitchell was addicted to drugs, the children were able to walk to their grandmother's house, about 10 minutes away, where she would provide them with food. He also noted that Yarbrough often took care of Dorian's needs when Mitchell failed to do so.

Yarbrough's father likewise confirmed aspects of his son's early childhood years. He testified that although he remained in frequent contact with his son over the years, no lawyer or investigator ever contacted him on his son's behalf.

Yarbrough's father also testified that after Mitchell and his son moved out of his house and began living with Jenkins, he eventually learned of Mitchell's drug addiction and took his son to live with a half brother in Illinois. Yarbrough's father testified that when his son returned one year later and resumed living with Mitchell, she appeared to have overcome her addiction.

Finally, Yarbrough presented the testimony of his sister, Dorian Jenkins, and his cousin, Anthony Riley. Both testified that Yarbrough's trial counsel did not contact them. Riley stated that although he was very young at the time, he

remembered "rampant" drug activity in Yarbrough's childhood home, as well as very poor living conditions. Dorian Jenkins, who lived with Yarbrough and Mitchell until she was five years old, described very dirty living conditions, with the frequent absence of electricity and water. She also stated that Yarbrough often helped feed her and did "anything [else] I needed for him to do."

The warden presented testimony from the investigator, William Smith, who testified that Yarbrough did not provide any information about his childhood living conditions. Smith stated that Yarbrough did not indicate that there were problems in his home life during his childhood, nor did he suggest any circumstances that would have required additional investigation. Smith also testified that Mitchell never mentioned her drug addiction, nor did she indicate any unusual problems that occurred during Yarbrough's childhood years. Smith acknowledged that he did not request any records from social service agencies, explaining that he did not think that he could obtain access to them.

The warden also presented testimony from Ward, who stated that Mitchell portrayed herself to him as a "good mother with a problem that she was working her way through." According to Ward, Mitchell did not discuss any details of her drug use or

provide information about any other difficulties Yarbrough

encountered during his childhood years.

Ward testified that he would have liked to have had Dorian

Jenkins' testimony at the penalty phase proceeding of the trial.

He did not consider contacting her, however, because Yarbrough

had not seen her in many years.

Ward further testified that while it would have been

possible to present a mitigation case based solely on

Yarbrough's difficult childhood, he would have preferred to

include the testimony of an expert regarding the impact of such

a childhood on Yarbrough.  Ward conceded, however, that he did

not ask the circuit court to appoint a new expert to replace Dr.

Nelson.

In its report, the circuit court found that Ward was unable

to obtain substantial information from the witnesses he

interviewed, and that he did not attempt to obtain any

additional information from other witnesses.  The court

concluded that Ward received little assistance from Yarbrough,

his mother, and his grandmother.

The court found that Mitchell and Jenkins both used alcohol

and drugs during Yarbrough's childhood, but that they attempted

to conceal their drug use from their children.  The court also

found that although there was neglect and privation in

Yarbrough's childhood history, these circumstances did not

11

result from the mother's willful misconduct toward her children but from her inability to care for them during the unspecified period that she was addicted to crack cocaine.

The court noted that on Yarbrough's return from his one-year stay in Illinois, Mitchell's condition had improved. The court also found that although Mitchell occasionally "slipped and slid," she "managed to straighten out her life and avoid her prior difficulties with crack cocaine use." The court further concluded that there was no credible evidence that Yarbrough had been the victim of physical or sexual abuse.

In addition, the circuit court found that the testimony of both Anthony Riley and Dorian Jenkins was incredible. The court concluded that because Dorian's testimony described living conditions when she was at most five years old and these events occurred about 15 years before she testified, her testimony was "questionable as it was likely influenced by what others had told her rather than her personal recollection." The court further found that Anthony Riley's testimony "came across as overreaching and exaggerated – almost rehearsed."

In its proposed conclusions of law, the circuit court recommended that Yarbrough's habeas corpus petition be dismissed because Yarbrough failed to demonstrate that he was prejudiced by his counsel's performance. The court first concluded that Yarbrough's counsel rendered ineffective assistance because he

12

failed to investigate aggressively Yarbrough's personal history and, thus, could not make a reasonable strategic decision regarding whether to present mitigation evidence based on a claim that Yarbrough suffered neglect as a child. The court further concluded, however, that the mitigation evidence received at the habeas hearing was insufficient to demonstrate a reasonable probability that the outcome of the second penalty phase proceeding would have been different had that evidence been considered by the jury.

### III. DISCUSSION

Yarbrough argues that his trial counsel rendered ineffective assistance at the second penalty phase proceeding. He asserts that Ward should have conducted a more thorough background investigation in order to obtain and present mitigation evidence during the penalty phase. Yarbrough contends that Ward failed to contact witnesses who would have been able to provide information that Yarbrough was severely neglected as a child, and also failed to pose detailed questions about his upbringing to those witnesses who were interviewed.

Yarbrough also asserts that the circuit court applied the wrong standard of proof at the habeas hearing in reaching its conclusion that Yarbrough did not suffer prejudice as a result of his counsel's performance. He maintains that the court erroneously indicated that he was required to prove that the

13

available mitigation evidence outweighed the evidence in aggravation of the offense. In the alternative, Yarbrough contends that he met his actual burden of proof, namely, that there was a reasonable probability that if the available mitigation evidence had been presented to the jury during the second penalty phase proceeding, the jury would have reached a different result.

In response, the warden argues that Ward provided effective assistance of counsel during the second penalty phase proceeding. The warden notes that Ward investigated Yarbrough's personal history and reasonably determined that he would not benefit from further investigation. The warden also contends that it was reasonable for Ward to have relied on Yarbrough's indication that he experienced no particular problems during his childhood, and that there would be no benefit to be derived from contacting his extended family.

The warden also argues that the circuit court correctly held that Yarbrough was not prejudiced by his counsel's alleged failure to investigate and present evidence of Yarbrough's personal history. The warden observes that at the habeas hearing, Yarbrough did not present evidence of sexual or physical abuse, extreme neglect, or other substantial mitigating evidence. Thus, the warden contends that Yarbrough failed to meet his burden of proving that but for his counsel's alleged

ineffective assistance, the jury would have fixed his punishment at life imprisonment.

In reviewing the circuit court's findings of fact and conclusions of law submitted pursuant to Code § 8.01-654(C), we defer to the court's factual findings and are bound by them unless they are plainly wrong or without evidentiary support. Lovitt v. Warden, 266 Va. 216, 229, 585 S.E.2d 801, 808 (2003), cert. denied, ___ U.S. ___, 124 S.Ct. 2018 (2004); Hedrick v. Warden, 264 Va. 486, 496, 570 S.E.2d 840, 847 (2002). However, we review de novo the circuit court's recommended conclusions of law, because they involve mixed questions of law and fact. Lovitt, 266 Va. at 229, 585 S.E.2d at 808; Hedrick, 264 Va. at 496, 570 S.E.2d at 847; see Strickland v. Washington, 466 U.S. 668, 698 (1984).

We consider the circuit court's submissions in the context of Yarbrough's Sixth Amendment right to counsel, which includes the right to the effective assistance of counsel. Strickland, 466 U.S. at 685-86; see Roe v. Flores-Ortega, 528 U.S. 470, 476 (2000); United States v. Cronic, 466 U.S. 648, 654 (1984); Lovitt, 266 Va. at 248, 585 S.E.2d at 820; Sheikh v. Buckingham Corr. Ctr., 264 Va. 558, 564, 570 S.E.2d 785, 788 (2002). This guarantee entitles a criminal defendant to counsel who is reasonably competent and who provides advice that is within the range of competence required of attorneys in criminal cases.

15

Strickland, 466 U.S. at 687; see Wiggins v. Smith, 539 U.S. 510, 521 (2003); Kimmelman v. Morrison, 477 U.S. 365, 384 (1986); Lovitt, 266 Va. at 249, 585 S.E.2d at 820; Green v. Young, 264 Va. 604, 609, 571 S.E.2d 135, 138 (2002).

To prevail on a claim of ineffective assistance of counsel, a petitioner must ordinarily satisfy both parts of the two-part test established in Strickland. Strickland, 466 U.S. at 687; Lovitt, 266 Va. at 249, 585 S.E.2d at 820; see Wiggins, 539 U.S. at 521; Williams v. Taylor, 529 U.S. 362, 390 (2000). The petitioner must first show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687-88; see also Wiggins, 539 U.S. at 521; Bell v. Cone, 535 U.S. 685, 695 (2002); Williams, 529 U.S. at 390-91; Lovitt, 266 Va. at 249, 585 S.E.2d at 820. In deciding this question, the court considering the habeas corpus petition "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; see also Kimmelman, 477 U.S. at 381; Lovitt, 266 Va. at 249, 585 S.E.2d at 820.

To prove that counsel's conduct fell outside the range of reasonable professional assistance, a petitioner must overcome the presumption that under the particular circumstances of the case, the challenged actions may be considered sound trial strategy. Strickland, 466 U.S. at 689; Lovitt, 266 Va. at 249,

16

585 S.E.2d at 820; see Bell, 535 U.S. at 698; Darden v. Wainwright, 477 U.S. 168, 186 (1986).  However, "strategic choices made after less than complete investigation are reasonable" only "to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690-91; see also Wiggins, 539 U.S. at 521; Burger v. Kemp, 483 U.S. 776, 794 (1987); Lovitt, 266 Va. at 249, 585 S.E.2d at 821.

Addressing the investigation and presentation of mitigation evidence, the Supreme Court observed in Wiggins that "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case."  Wiggins, 539 U.S. at 533.

Instead, in determining whether trial counsel exercised reasonable professional judgment regarding the investigation and presentation of mitigation evidence, a reviewing court must focus on whether the investigation resulting in counsel's decision not to introduce certain mitigation evidence was itself reasonable.  Id. at 523; Strickland, 466 U.S. at 690-91; Lovitt, 266 Va. at 250, 585 S.E.2d at 821.  In making this determination, "a court must consider not only the quantum of evidence already known to counsel, but also whether the known

17

evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527; see also Lovitt, 266 Va. 250, 585 S.E.2d at 821.

If the reviewing court concludes that counsel's performance was deficient under the first part of the Strickland test, a petitioner seeking relief must also establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Lovitt, 266 Va. at 250, 585 S.E.2d at 821; Hedrick, 264 Va. at 496-97, 570 S.E.2d at 847.

A reviewing court, however, is not required to decide whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." Strickland, 466 U.S. at 697. As the Supreme Court has stated, "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.; see also Lovitt, 266 Va. at 250, 585 S.E.2d at 821; Strickler v. Murray, 249 Va. 120, 128, 452 S.E.2d 648, 652, cert. denied, 516 U.S. 850 (1995).

When a prejudice determination involves the failure to pursue the presentation of mitigation evidence, the reviewing court is required to evaluate the totality of the available mitigation evidence, both that adduced at trial and that presented at the habeas hearing, along with the evidence in aggravation of the offense received at trial. Wiggins, 539 U.S. at 536; Williams, 529 U.S. at 397-98; Lovitt, 266 Va. 250, 585 S.E.2d at 821.

In the present case, Yarbrough's contentions address trial counsel's alleged failure to investigate his family background, which he asserts contained evidence of neglect and drug abuse by his mother, impoverished living conditions, and general abuse resulting from his mother's drug-related activities. As recommended by the Supreme Court in Strickland, we move directly to consider the second prong of the two-part test, namely, the issue whether Yarbrough suffered prejudice sufficient to undermine confidence in the outcome of the second penalty phase proceeding as a result of his counsel's failure to investigate and present available mitigation evidence.[2]  See Strickland, 466

_____

[2] Because we address the issue of prejudice directly, we need not consider and we express no opinion on the circuit court's finding that Yarbrough received ineffective assistance of counsel in the second penalty phase proceeding. Such finding, having not been adopted by this Court, has no effect in these proceedings.

U.S. at 694; see also Williams, 529 U.S. at 391; Lovitt, 266 Va. at 252, 585 S.E.2d at 822.

Initially, we find no merit in Yarbrough's argument that the circuit court applied the wrong standard of proof in making its prejudice determination by requiring Yarbrough to show that the mitigating evidence outweighed the evidence in aggravation of the offense. Contrary to Yarbrough's contention, the circuit court based its prejudice determination on the Strickland standard whether there was a reasonable probability of a different result at the second penalty phase proceeding if the totality of the available mitigation evidence had been presented to the jury.

In reaching its conclusion that Yarbrough had not satisfied the Strickland standard, the circuit court observed that the evidence in aggravation "more than outweighs" the available mitigating evidence. This statement did not impose a separate evidentiary standard in violation of Strickland but merely served to explain the court's view that the evidence in mitigation did not even closely approach the evidence in aggravation presented at Yarbrough's trial.

Moreover, as we have already observed, we are required to make our own prejudice determination without any deference to the circuit court's recommended conclusion of law, because this issue is subject to our de novo review. Lovitt, 266 Va. at 229,

585 S.E.2d at 808; Hedrick, 264 Va. at 496, 570 S.E.2d at 847; see Strickland, 466 U.S. at 698. Thus, we proceed to consider this mixed question of law and fact under the established principles stated above.

In making our prejudice determination, we rely on the Wiggins decision in which the Supreme Court, applying Strickland, invalidated a habeas petitioner's death sentence based on the prejudicial effect of trial counsel's failure to investigate and present certain mitigation evidence to the jury at the petitioner's sentencing proceeding. Wiggins, 539 U.S. at 537-38. There, the petitioner was convicted of capital murder in a bifurcated trial. Id. at 515-16. Trial counsel decided not to present any mitigation evidence during the penalty phase, and instead sought to prove that the evidence was insufficient to prove that the defendant was the actual perpetrator of the murder rather than a lesser participant in the crime. Id. Under Maryland law, this determination is made at the penalty phase of a capital murder trial, and a jury may sentence a defendant to death only if it determines that the defendant was the actual perpetrator of the crime. See Md. Code Ann., Crim. Law § 2-202 (2002).

Before adopting this approach, trial counsel had the defendant evaluated by a psychologist, who concluded that the defendant "had an IQ of 79, had difficulty coping with demanding

21

situations, and exhibited features of a personality disorder."
Wiggins, 539 U.S. at 523. However, the psychologist's report
did not discuss the defendant's extensive personal history. Id.
Trial counsel also reviewed court and social services records,
which referred to the defendant's "misery as a youth" and to the
fact that he had spent most of his childhood years in foster
care. Id.

At the habeas hearing in Wiggins, the petitioner presented
a report from a psychologist, who stated that the petitioner had
"experienced severe privation and abuse in the first six years
of his life while in the custody of his alcoholic, absentee
mother." Id. at 534-35. The psychologist also stated that the
petitioner "suffered physical torment, sexual molestation, and
repeated rape during his subsequent years in foster care." Id.
at 535. Additionally, the evidence showed that the petitioner
was homeless for a period of time and had "diminished mental
capacities." Id.

The Supreme Court held that trial counsel's decision to
limit their investigation of mitigation evidence was
unreasonable, because the information counsel had seen in the
social services records would have led a reasonably competent
attorney to conduct a further investigation. Id. at 534. The
Court determined that the petitioner suffered prejudice as a
result of counsel's unprofessional errors of judgment because

22

the mitigating evidence that counsel failed to discover and present was "powerful." Id.

Mindful of this analysis, we consider the evidence presented at Yarbrough's habeas hearing and the circuit court's recommended findings of fact. The evidence of Yarbrough's personal history consisted of testimony from family members and friends. As stated above, the circuit court found the testimony of both Dorian Jenkins and Anthony Riley incredible. Having rejected the testimony of these two witnesses, the circuit court made its findings of fact based on the remaining evidence received at the habeas hearing.

We conclude that the testimony of Yarbrough's mother and grandmother supports the circuit court's finding that although Yarbrough faced periods of privation and neglect during his childhood due to his mother's drug addiction, at other times she provided adequately for him under difficult circumstances. Their testimony also supports the court's finding that Yarbrough's mother did not regularly use drugs after she admitted her problem to her mother and took action to correct it.

We also conclude that in addition to the testimony of Yarbrough's mother and grandmother, evidence from Willis Jenkins and Yarbrough's father supports the circuit court's conclusion that Yarbrough was not physically or sexually abused as a child.

23

Further, the testimony of Willis Jenkins and Yarbrough's grandmother supports the court's finding that Yarbrough often cared for himself and his sister as a result of his mother's drug addiction. Thus, we conclude that there is evidence in the record to support these recommended findings of fact, and we apply them in undertaking our prejudice analysis. See Lovitt, 266 Va. at 229, 585 S.E.2d at 808; Hedrick, 264 Va. at 496, 570 S.E.2d at 847.

In determining prejudice, we "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534; see also Williams, 529 U.S. at 397-98; Lovitt, 266 Va. at 256, 585 S.E.2d at 824-25. The evidence in aggravation at Yarbrough's second penalty phase proceeding included the brutal nature of the attack on Hamby, a 77-year old man, which appeared to be an attempted decapitation. Also in aggravation was the fact that Hamby was alive when all ten of the knife wounds were inflicted on him, and that he may have lived for 15 minutes as he bled to death. The evidence also showed that Yarbrough continued to cut Hamby's neck in a sawing motion even after Hamby pleaded with Yarbrough to stop cutting him.

The mitigation evidence concerning Yarbrough's childhood home life showed that his mother was addicted to crack cocaine for an unspecified period of time, and that the family lost its

24

home and later faced substandard living conditions at different locations.  During the time of her drug addiction, Yarbrough's mother sometimes neglected her children.  Yarbrough frequently helped to take care of his sister to compensate for his mother's failure to do so.

Because of his mother's drug addiction, Yarbrough was required to live with relatives on two occasions, and his sister was removed permanently from the mother's home.  The mitigation evidence also showed that Yarbrough had no prior record.

In contrast to the penalty phase evidence in Wiggins, the record from Yarbrough's second penalty phase proceeding shows that counsel presented some recent personal background information for the jury's consideration.  That testimony, provided by Yarbrough's former prison counselor, showed that Yarbrough had adjusted to prison life in that he had not received any adverse disciplinary reports during the time he had been incarcerated.

We further observe that there was no mitigation evidence presented at the habeas hearing showing that Yarbrough has a diminished mental capacity.  This aspect of his case constitutes a major distinction from the evidence presented in Wiggins, which showed that the petitioner exhibited "borderline retardation."  Wiggins, 539 U.S. at 518.  Also missing from the

25

present case is the evidence of extreme physical abuse that permeated the record in Wiggins.

These critical differences likewise distinguish Yarbrough's case from Williams. There, the Supreme Court concluded that a defendant had suffered prejudice resulting from his counsel's failure to present substantial mitigation evidence at the penalty phase of his capital murder trial. Williams, 529 U.S. at 396-98. The evidence presented at the habeas hearing in that case showed that the petitioner was "borderline mentally retarded" and had suffered extreme abuse and neglect as a child. Id. at 370. That evidence included documents that "dramatically described mistreatment, abuse, and neglect during his early childhood, as well as testimony that he . . . had suffered repeated head injuries, and might have mental impairments organic in origin." Id.

With these distinctions in mind, and reviewing the evidence in mitigation and aggravation of the offense in accordance with the holding of Wiggins, we conclude that Yarbrough has failed to demonstrate that his defense was prejudiced by trial counsel's failure to investigate and present the available mitigation evidence introduced at the habeas hearing. We hold that the record does not demonstrate that, but for his trial counsel's alleged failures, there is a reasonable probability that the result of the second penalty phase proceeding would have been

26

different.  See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Lovitt, 266 Va. at 257, 585 S.E.2d at 825.  In short, the record before us does not undermine confidence in the outcome of the proceedings.  See Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534; Williams, 529 U.S. at 391; Lovitt, 266 Va. at 257, 585 S.E.2d at 825.

For these reasons, we will dismiss the petition for a writ of habeas corpus.

Petition dismissed.