**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

ROBERT STACY YARBROUGH,
        *Petitioner-Appellant,*

v.

GENE M. JOHNSON, Director,
Virginia Department of Corrections,
        *Respondent-Appellee.*

No. 07-10

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Jerome B. Friedman, District Judge.
(2:05-cv-00368-JBF)

Argued: December 6, 2007

Decided: March 17, 2008

Before NIEMEYER and TRAXLER, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Traxler and Senior Judge Hamilton joined.

---

## COUNSEL

**ARGUED:** F. Nash Bilisoly, IV, VANDEVENTER & BLACK,
L.L.P., Norfolk, Virginia, for Appellant. Matthew P. Dullaghan,
Senior Assistant Attorney General, OFFICE OF THE ATTORNEY
GENERAL, Richmond, Virginia, for Appellee. **ON BRIEF:** Trey R.
Kelleter, VANDEVENTER & BLACK, L.L.P., Norfolk, Virginia;

Jennifer L. Givens, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant. Robert F. McDonnell, Attorney General, Jerry P. Slonaker, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellee.

**OPINION**

NIEMEYER, Circuit Judge:

A jury in Mecklenburg County, Virginia, convicted Robert Yarbrough of the 1997 capital murder and robbery of Cyril Hamby, and sentenced him to death. The Supreme Court of Virginia vacated his sentence because of an erroneous jury instruction. On remand, a second jury sentenced Yarbrough to death again, and the Supreme Court of Virginia affirmed.

After exhausting state procedures for post-conviction relief, Yarbrough filed the present petition for a writ of habeas corpus under 28 U.S.C. § 2254, asserting six grounds for relief. The district court denied Yarbrough's petition, but granted him a certificate of appealability with respect to his claim that his trial counsel was constitutionally ineffective because he failed to request that the trial court appoint a DNA expert at public expense. We expanded the certificate of appealability to include Yarbrough's claim that the trial counsel was constitutionally ineffective for inadequately investigating and presenting evidence in mitigation at sentencing.

For the reasons that follow, we affirm the district court's dismissal of Yarbrough's two claims for which a certificate of appealability has been issued, concluding that in denying these claims on the merits, the Supreme Court of Virginia neither unreasonably applied clearly established federal law nor made an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

I

The facts, as stated by the Supreme Court of Virginia in *Yarbrough v. Commonwealth* (*Yarbrough I*), 519 S.E.2d 602, 603-07 (Va. 1999),

begin with Yarbrough inviting his high-school friend, Dominic Rainey, to join him in his plan to rob Cyril Hamby, the 77-year-old owner of Hamby's Store, located a short walk from Yarbrough and Rainey's homes on U.S. Route 1 in Mecklenburg County, Virginia. An eyewitness' testimony placed the two men walking along the highway toward the store between 9:30 and 10:30 p.m. on May 8, 1997. The two then waited outside the store until there were no customers inside, entered the store, and locked the door behind them.

Yarbrough, armed with a shotgun, ordered Hamby to lie on the floor in an aisle, and, with Rainey's help, bound Hamby's hands behind his back. Yarbrough shut off the store's outside lights and demanded that Hamby reveal where guns were hidden in the store. When Hamby denied having any guns, Yarbrough kicked Hamby in the head and upper arms. Yarbrough then forced open the cash register and took the money inside. After returning to Hamby, he again demanded to know the location of the guns. Hamby continued to deny having any guns, at which point Yarbrough put down the shotgun, took out a pocketknife, and proceeded to cut deeply into the front and the back of Hamby's neck with a sawing motion. According to Rainey, Hamby pleaded with Yarbrough to stop cutting him, but Yarbrough did not stop and inflicted at least 10 deep wounds before rifling through Hamby's clothing and taking his wallet. Yarbrough and Rainey then stole beer, wine, and cigarettes, as well as the money Yarbrough had taken from the cash register, and exited the store from the rear. Yarbrough gave Rainey $100 and kept the remainder of the money for himself.

The two proceeded to Rainey's residence, where they changed clothes, and then went to the nearby home of Conrad Dortch, where they drank the wine from Hamby's store and waited for Dortch to arrive so they could buy marijuana from him. Dortch came home at approximately 12:45 a.m. and sold Yarbrough a marijuana joint for $10. According to Rainey, Yarbrough was "flashing" his money. Yarbrough and Rainey then returned to Rainey's home, where they spent the rest of the night. The next morning, Yarbrough threw his bloodstained tennis shoes in a trash barrel behind Rainey's house and left.

After Hamby's body was discovered on May 9, 1997, and an autopsy was conducted, it was determined that Hamby had bled to

death from multiple deep wounds around his neck. The Commonwealth's medical examiner described the wounds as "entirely consistent" with "an attempted beheading," but because no major arteries were cut, it likely took several minutes for Hamby to bleed to death. The examiner also noted the blunt force injuries on Hamby's head and upper arm, which were consistent with having been kicked.

A day later, Dortch informed the police of his encounter with Yarbrough and Rainey on the night of Hamby's murder, prompting the police to obtain and execute a search warrant at Yarbrough's home where they recovered clothing and a pocketknife, both stained with blood. Police also recovered the tennis shoes from Rainey's home.

Subsequent forensic analysis of the items recovered, the crime scene, and samples taken from Hamby, Yarbrough, and Rainey, strongly supported the conclusion that both Yarbrough and Rainey were present at the scene of the murder and that Yarbrough was most likely the person who inflicted the fatal wounds on Hamby. DNA tests of the shoes and clothing established a match with Hamby's blood, and the DNA test of the knife established a mix of Hamby and Yarbrough's DNA on the blade. The blood stains on Yarbrough's clothes were consistent with a spray of blood resulting from trauma and were made "in close proximity to the trauma that released the blood." Prints from Yarbrough's tennis shoes were found near the circuit box in the store, behind the counter, and in the blood stains near Hamby's head. Prints from Rainey's boots were found near Hamby's feet and in the living quarters of the store.

Following a four-day trial, at which the Commonwealth presented the testimony of Rainey, other witnesses, police investigators, and forensic experts, as well as extensive physical evidence, the jury convicted Yarbrough of capital murder and robbery. In exchange for his testimony, Rainey was charged with first degree murder rather than capital murder, and he later pleaded guilty, receiving a sentence of 50 years' imprisonment, 25 of which were suspended.

At the sentencing phase, which followed immediately upon the completion of the guilt phase, the Commonwealth argued that the death penalty was appropriate for Yarbrough because his crime was "outrageously or wantonly vile, horrible or inhuman in that it

involved torture, depravity of mind or an aggravated battery to the victim." *See* Va. Code Ann. § 19.2-264.2. Yarbrough presented mitigation evidence in the form of testimony from his mother. The jury sentenced Yarbrough to death for the capital murder conviction and to life imprisonment for the robbery conviction.

On direct appeal, Yarbrough assigned several errors, and the Virginia Supreme Court rejected all but one. Because the trial court failed to inform the jury during the sentencing phase that if it sentenced Yarbrough to life imprisonment, he would be ineligible for parole, the court vacated the death sentence and remanded the case for a new sentencing trial. *See Yarbrough I*, 519 S.E.2d at 611-17.

The second sentencing trial took place before a newly empaneled jury. The evidence presented at that trial is summarized by the Virginia Supreme Court in *Yarbrough v. Commonwealth* (*Yarbrough II*), 551 S.E.2d 306, 308 (Va. 2001). The Commonwealth presented evidence that Yarbrough stabbed Hamby at least 10 times in the neck and that the wounds "penetrated to the junction between the neck and the skull at several locations on the rear of Hamby's neck." Other evidence described several blows to the head, and indicated that Hamby was still alive during the infliction of these wounds, remaining alive for up to 15 minutes as he bled to death. The Commonwealth also produced Rainey, who testified that Hamby begged for mercy while Yarbrough continued his "sawing motion" on Hamby's neck. In addition, several family members and neighbors testified to Hamby's warmth, generosity, kindness, and thoughtfulness, as well as to the devastating impact his murder had on his family.

In mitigation, Yarbrough again presented testimony from his mother, who indicated that Yarbrough had lived with her his entire life except for two years when he lived with his grandmother. Yarbrough also called a prison counselor to testify that he had not received any adverse disciplinary reports while incarcerated. In opening and closing arguments, Yarbrough's counsel, Buddy Ward, attempted to cast doubt on Rainey's veracity and urged the jury to "stop the killing" by sparing Yarbrough's life.

After less than an hour of deliberation, the jury sentenced Yarbrough to death, finding explicitly that the murder was "vile" and that

the mitigating evidence did not outweigh this aggravating factor. On his second direct appeal, the Virginia Supreme Court affirmed, *Yarbrough II*, 551 S.E.2d at 399-400, and the United States Supreme Court denied Yarbrough's petition for a writ of certiorari, *Yarbrough v. Virginia*, 535 U.S. 1060 (2002).

Seeking state post-conviction relief, Yarbrough filed a petition for a writ of habeas corpus with the Supreme Court of Virginia on July 12, 2002. The petition raised several claims, including, as relevant here, claims that Yarbrough's trial counsel (1) was ineffective by failing adequately to challenge the Commonwealth's forensic evidence, specifically by failing to request appointment of a DNA expert at public expense, and (2) was ineffective by failing adequately to investigate and present relevant evidence in mitigation at the second sentencing trial. The Virginia Supreme Court rejected Yarbrough's claims and dismissed his petition in an unpublished opinion. *Yarbrough v. Warden* (*Yarbrough III*), No. 021660 (Va. May 29, 2003).

Relying in part on the decision of the United States Supreme Court in *Wiggins v. Smith*, 539 U.S. 510 (2003), which was handed down on June 26, 2003, Yarbrough petitioned the Virginia Supreme Court for rehearing, claiming that his trial counsel was deficient in failing to investigate and present mitigation evidence. The Virginia Supreme Court granted Yarbrough's petition for a rehearing limited to the mitigation evidence claim, and it ordered the Circuit Court of Mecklenburg County to conduct an evidentiary hearing. *See* Va. Code Ann. § 8.01-654(C).

At the hearing, Yarbrough presented testimony from his trial counsel, his mother, his father, his mother's ex-boyfriend, his grandmother, his cousin, and his half-sister. The Commonwealth recalled Yarbrough's trial counsel and presented testimony from his trial counsel's investigator. Following the hearing, the Circuit Court submitted proposed findings of fact and conclusions of law to the Virginia Supreme Court, recommending a finding that Yarbrough's trial counsel's performance was constitutionally deficient but that it did not result in prejudice to the outcome of the case and therefore that Yarbrough was not entitled to relief. *Yarbrough v. Warden* (*Yarbrough IV*), No. 021660 (Va. Cir. Ct. May 6, 2004).

The Supreme Court of Virginia adopted most of the Circuit Court's recommendations for findings of fact, as well as its recommendation that there was no prejudice, and it dismissed Yarbrough's petition. *Yarbrough v. Warden* (*Yarbrough V*), 609 S.E.2d 30, 40 (Va. 2005). Because the Virginia Supreme Court found no prejudice, it did not review or adopt the Circuit Court's recommended conclusion that Yarbrough's trial counsel was deficient. *Id.* at 38 n.2.

Yarbrough commenced the present action by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254, raising six issues, including the ineffective assistance claims for failure to seek public funds for a DNA expert and for failure to investigate and present mitigating evidence. The district court referred the petition to a magistrate judge, who submitted a report and recommendation that all six claims be denied and that Yarbrough's petition be dismissed. *Yarbrough v. Johnson* (*Yarbrough VI*), No. CIV A 205CV368, 2006 WL 2583418 (E.D. Va. Sept. 5, 2006). The district court adopted most of the magistrate judge's recommendations, modified others, and arrived at the same conclusion that all six of Yarbrough's claims should be denied. *Yarbrough v. Johnson* (*Yarbrough VII*), 490 F. Supp. 2d 694 (E.D. Va. 2007). Concluding that Yarbrough's DNA evidence claim was his "strongest argument," the district court granted Yarbrough's motion for a certificate of appealability on that issue. *Id.* at 740-41. By order dated October 2, 2007, we expanded the certificate of appealability to include Yarbrough's mitigation evidence claim.

II

Yarbrough contends first that he was denied effective assistance of counsel during the guilt phase of his state trial because "DNA evidence was critical to the prosecution and the defense in this case not involving a confession" and his counsel "fail[ed] to request funds to engage an expert in DNA collection, testing and analysis." The failure to seek funds to hire an expert, he argues, fell below "prevailing professional norms" as they are defined by the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which he asserts require that "expert assistance should *always* be requested and provided" for the "proper preparation of capital cases" (emphasis

added), and which are not to be taken as "aspirational" but as a minimum standard under the Sixth Amendment.

The Commonwealth of Virginia contends that the district court properly dismissed Yarbrough's habeas claim because Yarbrough failed "to establish that his trial counsel successfully could have moved for the appointment of such an expert." Adopting the district court's conclusion that public funds for a DNA expert would be available only if Yarbrough established a "particularized need" for the expert under *Husske v. Commonwealth*, 476 S.E.2d 920 (Va. 1996), Virginia argues that because Yarbrough could not establish such a need, his counsel's "failure to move for the appointment [could] not have been deficient."

Yarbrough first presented his ineffective assistance of counsel claim to the Virginia Supreme Court in a petition for a writ of habeas corpus filed on July 12, 2002, relying on *Strickland v. Washington*, 466 U.S. 668 (1984).[1] In dismissing the claim the Supreme Court ruled:

> The Court holds claim (III)(C)(1) satisfies neither the "performance" nor the "prejudice" prong of the two-part test enunciated in *Strickland*. Petitioner has failed to allege any facts that would suggest that counsel's performance was inadequate. Petitioner has failed to show a particularized need for the assistance of an independent expert or that he was prejudiced by the lack of expert assistance. *Husske v. Commonwealth*, 252 Va. 203, 213, 476 S.E.2d 920, 926 (1996). Furthermore, petitioner has failed to identify the items that were not tested by the Commonwealth or how testing of those items would disprove petitioner's guilt. Thus, petitioner has failed to demonstrate how counsel was ineffective for failing to obtain an independent expert and failing to request that the unspecified items undergo testing.

---

[1]*Strickland* held that to establish a claim under the Sixth Amendment for ineffective assistance of counsel, the petitioner must demonstrate "that counsel's performance was deficient" and that "the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687; *see also Emmett v. Kelly*, 474 F.3d 154, 160 (4th Cir. 2007).

Furthermore, he has failed to demonstrate that there is a reasonable probability that, but for counsel's alleged error, the result of the proceeding would have been different.

*Yarbrough III*, No. 021660, op. at 8-9.

In considering this claim again on a petition under 28 U.S.C. § 2254, a federal court owes considerable deference to the judgment entered in the state court proceeding. *See* 28 U.S.C. § 2254(d), (e). Section 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

And § 2254(e)(1) instructs that "a determination of a factual issue made by a State court shall be presumed to be correct" and that the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

A state decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Meyer v. Branker*, 506 F.3d 358, 364-65 (4th Cir. 2007). "An 'unreasonable application' occurs when a state court identifies the correct governing

legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks omitted); *Lenz v. Washington*, 444 F.3d 295, 300 (4th Cir. 2006). In applying these standards when reviewing a state decision under § 2254(d), the question, therefore, is not "whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007) (citing *Williams*, 529 U.S. at 410); *Strong v. Johnson*, 495 F.3d 134, 140 (4th Cir. 2007).

We review the district court's dismissal of a habeas petition *de novo. Meyer*, 506 F.3d at 364.[2]

In presenting his ineffective assistance of counsel claim to the district court, Yarbrough argued that the performance of his trial counsel, Buddy Ward, was deficient because, inasmuch as the prosecution's case depended on DNA evidence, it was "incumbent on competent counsel to make some attempt to, at the least, investigate the DNA analysis and discredit the scientific evidence through an independent expert and education on DNA analysis." Yarbrough maintained, "Had the forensic evidence been tested and found to be flawed or even false, only the testimony of an admitted felon with a deal would have placed [him] inside Mr. Hamby's store that night."

Identifying areas in which an expert could have assisted counsel, Yarbrough pointed to multiple alleged errors or deficiencies in the Commonwealth's forensic analysis. For example, certain samples were tested at only 10 genetic loci, instead of 23, because the State only had the capability to test at the 10. Certain samples failed to yield interpretable results. With respect to certain results, no statistical

---

[2]The district court reviewed the Virginia Supreme Court judgment *de novo* because it concluded that the Supreme Court had incorrectly observed that Yarbrough had failed to identify specific items that were not tested but should have been. *Yarbrough VII*, 490 F. Supp. 2d at 714-15. Because our review of the district court is *de novo*, we also examine the state court's judgment directly, as the district court did, giving it the deference that is due in the circumstances.

probabilities were given. Finally, certain items were not tested at all. But Yarbrough never explained how the test results that *were* obtained and that pointed only at him as the murderer could be reversed or ignored, nor how an expert's review might otherwise have helped him in the context of these alleged deficiencies. He simply *hoped* that the expert might find something to help his case.

Yarbrough also never explained how he overcame "the presumption that, under the circumstances, the challenged action [of his attorney] might be considered sound trial strategy," namely, a decision to focus on advancing arguments that counsel could actually make or reasonably found more persuasive. *Strickland*, 466 U.S. at 689 (internal quotation marks omitted). This presumption was especially strong here in view of the fact that in Virginia state funds were not available for an expert witness unless a defendant was able to show a "particularized need" for the expert testimony. *See Husske*, 476 S.E.2d at 925. And under state law, such a "particularized need" could not have been demonstrated by conclusory assertions, but rather had to be demonstrated by a specific showing of how expert testimony would assist in the defense. *Id.* at 925-26; *see also Commonwealth v. Sanchez*, 597 S.E.2d 197, 200 (Va. 2004). In *Sanchez*, the Virginia Supreme Court denied a request for state funds for an expert specifically because the defendant's demonstration of need was not particularized and rested on nothing more than the petitioner's "hope or suspicion." In accordance with *Strickland*, we presume that Ward knew of these barriers and developed a "sound trial strategy" in light of his inability to surmount them. And Yarbrough has given us no basis to rebut that presumption.

Yarbrough faced overwhelming forensic evidence that tied him to the scene, that corroborated Rainey's testimony, and that placed him (Yarbrough) in the role of primary perpetrator. Without any indication or theory about how the DNA evidence might be wrong, any expectation of what benefit might be obtained from retaining a DNA expert could only be characterized as a dim hope. Ward was fighting an uphill battle for Yarbrough, and he performed as ably as one could expect in the circumstances. This is meaningful when recognizing that Ward was a seasoned criminal lawyer who had tried more capital cases than he could remember.

Not only did the Virginia Supreme Court have all of this information before it, the district court separately and exhaustively examined Ward's cross-examination of the Commonwealth's forensic experts, noting that he effectively subjected the Commonwealth's evidence to adversarial testing such that the proper functioning of the adversarial process was not undermined and could be relied on to produce a just result. *Yarbrough VII*, 490 F. Supp. 2d at 724-27; *see also Strickland*, 466 U.S. at 685-86. While the district court did acknowledge that Ward made some errors, which revealed limits of his knowledge, it did not conclude that these errors in any way lessened Ward's ability to test the Commonwealth's case and to ensure that the trial was reliable.

In view of these facts, we cannot say that the Virginia Supreme Court's conclusion that Ward's performance was not deficient was an unreasonable application of federal law, particularly *Strickland*. *See* 28 U.S.C. § 2254(d)(1). In determining whether Ward's performance was constitutionally deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," in order to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. As the Supreme Court in *Strickland* stated:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgement. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

> * * *

> In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 690-91.

To argue that Ward's performance was "outside the wide range of professionally competent assistance," Yarbrough relies heavily, and almost exclusively, on the ABA Guidelines, which were originally drafted in 1989 and revised in 2003. He argues that the ABA Guidelines establish "prevailing professional norms" that, when applied to measure Ward's performance, render it constitutionally deficient. He asserts that the ABA Guidelines require that "expert assistance should *always* be requested and provided" for the proper preparation of capital cases (emphasis added), and that the rules are "not aspirational," but minimum constitutional standards. The district court rejected this argument, holding that the failure to comply with the ABA Guidelines regarding the requesting of funds for expert assistance does not establish counsel's performance as constitutionally deficient *per se*. *See Yarbrough VII*, 490 F. Supp. 2d at 723-24.

We agree. Indeed, the ABA Guidelines themselves deliver a mixed message about whether they are aspirational or mandatory in every circumstance. On the one hand they would impose on defense counsel a mandatory, non-aspirational, minimum requirement to request public funds and obtain expert assistance in the preparation of virtually every capital case, because everywhere that the Guidelines direct what counsel "should" do, they advise that the term "should" is to be construed as a mandatory term. *See* ABA Guidelines intro. (1989) ("'Should' is used throughout as a mandatory term and refers to activities which are minimum requirements"). In this manner, the ABA Guidelines appear to mandate that "[u]tilization of experts has become the rule, rather than the exception, in proper preparation of capital cases," *id.* 1.1 cmt., and "counsel should demand on behalf of the client all necessary experts for preparation of both phases of trial," *id.* 11.4.1 cmt. On the other hand, the Guidelines also seem to acknowledge that a defendant cannot routinely have experts, because to have them requires calling upon local jurisdictions "to authorize sufficient funds to enable counsel in capital cases to conduct a thorough investigation . . . and to procure the necessary expert witnesses and documentary evidence," *id.* 8.1 cmt., which suggests an aspirational nature to the Guidelines. The Guidelines observe that "funds available to appointed defense counsel are *substantially* below those available to the prosecution" and that "[t]his inequity is unconscionable." *Id.* In short, the ABA Guidelines say that defense counsel should — now meaning only "should" — try to use experts more routinely,

but that this goal depends on government funding which, for now, does not allow this goal to be *achieved* routinely. This therefore can hardly be the mandated minimum standard, as Yarbrough claims.

Moreover, were we to treat the ABA Guidelines as establishing the minimum constitutional floor of "prevailing professional norms" for determining ineffective assistance of counsel, we would be forced to hold that a defense attorney who failed to obtain the expert assistance he "should" have secured was constitutionally deficient, *even if the jurisdiction in question would not have provided funds* for such an expert had the attorney asked for them. As the district court noted, the practice of providing defense attorneys "'few, if any, resources' to hire experts . . . has plainly been held to be constitutional and has continued for decades." *Yarbrough VII*, 490 F. Supp. 2d at 723. It simply is not the case that a lawyer who fails to request funds that are not available, or to which his client is not entitled under governing local law, has rendered ineffective assistance of counsel.

More fundamentally, to hold defense counsel responsible for performing every task that the ABA Guidelines say he "should" do is to impose precisely the "set of detailed rules for counsel's conduct" that the Supreme Court has long since rejected as being unable to "satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. Such a categorical holding would lead to needless and expensive layers of process with the unintended effect of compromising process. Would it lead to the requirement, for example, that anytime the government uses a sample of DNA in prosecuting a case, the defense lawyer would have to retain a DNA expert, regardless of the expert's likely contribution to the defense? Would such a rule similarly require a defense lawyer to retain experts every time the government introduces expert evidence that a substance is, for example, cocaine? Recognition of the ABA Guidelines as the minimum prevailing community standard would transform defense lawyers' judgments into mindless defensive reactions to a potential habeas claim, divorced from the individualized needs of professional representation. Those needs call for more nuanced responses than can be provided by following preestablished mechanical rules of representation. *See Roe v. Flores-Ortega*, 528 U.S. 470, 479 (2000); *Strickland*, 466 U.S. at

688-89 (cautioning against the fallacy of treating guidelines as a "checklist for judicial evaluation of attorney performance"); *Meyer*, 506 F.3d at 372 (same); *id.* at 371 ("[T]he touchstone of effective representation must be sound, evidence-based judgment, rather than a set of mandates counsel must programmatically follow without deviation"); *Walker v. True*, 401 F.3d 574, 583 n.7 (4th Cir. 2005) (noting that the *Strickland* inquiry "does not entail the application of *per se* rules" derived from ABA standards), *vacated on other grounds*, 546 U.S. 1086 (2006).

While the ABA Guidelines provide noble standards for legal representation in capital cases and are intended to improve that representation, they nevertheless can only be considered as a part of the overall calculus of whether counsel's representation falls below an objective standard of reasonableness; they still serve only as "guides," *Strickland*, 466 U.S. at 688, not minimum constitutional standards.

Inasmuch as we conclude that the Virginia Supreme Court's application of *Strickland* to this case was not unreasonable, we affirm the district court's decision dismissing Yarbrough's claim that his counsel's performance was deficient.

Because Yarbrough has not satisfied the deficient-performance prong of *Strickland*, we only briefly discuss the prejudice prong. Although an expert might have helped Buddy Ward poke a few more holes in the Commonwealth's case than he accomplished on his own, there is no basis to assume that any such minor victories would have created a reasonable probability that Yarbrough would have been acquitted. Short of expert testimony revealing gross incompetence or a criminal conspiracy to falsely implicate Yarbrough — and there is certainly no reasonable probability of either — it is most unlikely that, even with an expert, Yarbrough could have overcome the totality of evidence against him, which included not just forensic evidence, but also Rainey's testimony, eyewitness testimony placing him in the vicinity of the store, and Dortch's testimony regarding his actions after the murder.

At bottom, we hold that Yarbrough has established neither the performance prong nor the prejudice prong of *Strickland*, and his first claim for habeas relief was properly denied.

### III

Yarbrough also contends that his trial counsel performed below an objective standard of reasonableness because he failed adequately to investigate and present relevant evidence in mitigation at the second sentencing trial and that, but for this failure, there was a reasonable probability that the jury would not have sentenced him to death. *See Wiggins v. Smith*, 539 U.S. 510, 521, 534 (2003); *Strickland*, 466 U.S. at 690, 694.

When this claim was first presented to the Supreme Court of Virginia, the Court denied it on the merits, holding that Yarbrough had satisfied neither the performance prong nor the prejudice prong of *Strickland* because he had failed "to allege that such mitigation evidence was available to counsel or that petitioner desired such evidence to be presented at sentencing." The Court also gave as a reason the fact that such mitigation evidence could have been "cross-purpose evidence capable of aggravation as well as mitigation." *Yarbrough III*, No. 021660, op. at 13-14 (citing *Barnes v. Thompson*, 58 F.3d 971, 980-81 (4th Cir. 1995)).

After the United States Supreme Court decided *Wiggins*, the Virginia Supreme Court granted Yarbrough's petition for rehearing and directed the Circuit Court of Mecklenburg County to conduct an evidentiary hearing on the claim. The facts developed at this hearing are related by the Virginia Supreme Court in *Yarbrough V*, 609 S.E.2d at 33-36.

The Court described how Yarbrough's mother, Lorraine Mitchell, testified that when Yarbrough was seven or eight years old, she became addicted to crack cocaine, first as a "functional" addict who managed to provide for herself and her children and later as a "dysfunctional" addict who permitted bills to go unpaid and the cleanliness of her home, herself, and her children to deteriorate. She and her children — Yarbrough and his half-sister Dorian Jenkins, who was six years Yarbrough's junior — were eventually evicted from their home in Camden, New Jersey, and forced to move to a drug-infested low-income housing project. Also, Dorian Jenkins' father, Willis Jenkins, eventually moved out of the home, leaving only Mitchell and the two children in the house.

Mitchell testified that after she hit "rock bottom" in the summer of 1989 or 1990, when Yarbrough was eleven or twelve years old, Yarbrough's father, Robert Yarbrough, arranged for Yarbrough to live with relatives and attend school in Illinois for a year. That same year, Willis Jenkins permanently removed Dorian from Mitchell's care. When Yarbrough returned from Illinois the following summer, Mitchell had substantially recovered from her addiction, and she and Yarbrough thereafter lived in New Jersey, the Eastern Shore of Virginia, and finally Mecklenburg County, Virginia. During this period Yarbrough sometimes lived with his grandmother in Mecklenburg County.

Willis Jenkins, Robert Yarbrough, and Yarbrough's grandmother, Annie Mae Riley, also testified and substantially supported Mitchell's testimony. All four witnesses agreed that Mitchell had been addicted to crack cocaine and that she had neglected her parental responsibilities as a result. But they also testified that Yarbrough had always been a relatively well-behaved and responsible person and that there was never any indication, hint, or suggestion that Yarbrough had been physically or sexually abused. Evidence showed that when Yarbrough's mother was unable to care for herself or her children, Yarbrough would often do so, seeing to it that his half-sister got something to eat or was safely near her mother before he left for school.

Yarbrough's final two witnesses, his cousin Anthony Riley and his half-sister Dorian Jenkins, gave testimony about events that occurred when they were young children, no more than 14 and 5 years old, respectively. Their testimony roughly tracked that of the adults, although it painted an even harsher picture about conditions when Yarbrough and his half-sister lived with Mitchell in New Jersey.

Buddy Ward, Yarbrough's trial counsel, testified that both he and his investigator interviewed Yarbrough, Mitchell, and Mitchell's mother extensively, and that they conducted a "deep background check" that involved school and medical records from New Jersey and Virginia. According to Ward, none of the people interviewed were willing to say anything negative to him about Yarbrough's childhood or Mitchell's parenting. The picture Ward got from his investigation was simply that Mitchell had tried to be a good mother

but encountered problems and hard times, so she sent Yarbrough to live with her mother temporarily while she worked through her difficulties. In addition, Ward testified that a court-appointed psychologist, Dr. Evan Nelson, examined Ward and obtained some "clues" as to Mitchell's drug problems and a possible mitigation case based on maternal neglect. But Nelson also warned Ward not to call him as an expert witness to connect Yarbrough's upbringing to his crime, because in his opinion Yarbrough was "dangerous."

In response to the testimony given at the hearing by the Yarbrough family members, Ward testified that he had been aware of most of the circumstances they described, except the extent of Mitchell's drug use. While he acknowledged that he would have liked to have presented some of the lay testimony, particularly that of Yarbrough's half-sister Dorian Jenkins, he remained concerned that the testimony would have been a double-edged sword because it would have given the Commonwealth an opportunity to argue that Yarbrough deserved the death penalty not only due to the "vileness" of his crime, but also because he posed a "future danger." *See* Va. Code Ann. § 19.2-264.2.

After receiving the testimony, the Circuit Court of Mecklenburg County submitted proposed findings of fact to the Virginia Supreme Court and recommended finding that Ward had been deficient in failing to uncover, during his investigation, the full extent of Yarbrough's childhood difficulties but that Yarbrough had failed to establish prejudice because, after weighing the totality of mitigation evidence against the aggravating evidence, there was no reasonable probability that the jury would not have sentenced him to death. *Yarbrough IV*, No. 021660, op. at 16-20. The Supreme Court of Virginia accepted most of the Circuit Court's proposed factual findings and adopted its recommendation to deny Yarbrough's claim because he did not demonstrate prejudice. *Yarbrough V*, 609 S.E.2d at 37-40. The Supreme Court did not adopt the Circuit Court's conclusion that Yarbrough had established deficient performance and expressed no opinion as to that dimension of the claim. *Id.* at 38 n.2.

Again, federal review of the Virginia Supreme Court's judgment is limited to whether the judgment was "contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, or was "based on an unreasonable determination of the facts

in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Yarbrough argues that the Virginia Supreme Court "unreasonably applied" federal law because it "failed to weigh the mitigating evidence in this case independently and appropriately; instead, it merely compared it to that present in *Wiggins* and determined that it did not stack up." *Yarbrough VI*, 2006 WL 2583418, at *13. The district court "summarily" rejected this claim, observing that the state court did not compare the facts of *Wiggins*, *Williams*, *Rompilla*, and *Strickland* with the facts of Yarbrough's case "in a checklist fashion," but rather "merely for illustrative purposes," and that it weighed the totality of mitigating evidence against the evidence in aggravation and found no reasonable probability of a different result. *Yarbrough VII*, 490 F. Supp. 2d at 702. The district court concluded that it was "readily apparent that Yarbrough ha[d] failed to set forth an unreasonable application of United States Supreme Court precedent." *Id.*

We agree with the district court. The Virginia Supreme Court did not apply federal law unreasonably when it compared Yarbrough's evidence to that in *Wiggins* or *Williams* in order to evaluate its relative strength and ability to offset the aggravating evidence Yarbrough faced and to show a reasonable probability of a different result. Indeed, it was appropriate for the Virginia Supreme Court to have observed that unlike in *Wiggins* and *Williams*, Yarbrough presented no evidence at all of a diminished mental capacity, nor did he present any evidence to support a finding that he had been physically or sexually abused. *Yarbrough V*, 609 S.E.2d at 40. Mental capacity and extreme abuse were significant factors in the United States Supreme Court's determination that Wiggins and Williams had established prejudice, as such evidence was "powerful" in offsetting the State's evidence in aggravation in each case. *See Wiggins*, 539 U.S. at 534-38; *Williams*, 529 U.S. at 396-98; *see also Rompilla*, 545 U.S. at 390-93. When mitigation evidence presents significantly less hardship than that found in *Wiggins*, *Williams* and *Rompilla*, however, it follows that the evidence is significantly less "powerful." The question a reviewing court must answer in determining whether a petitioner was prejudiced by a failure to present such evidence, then, is not whether the evidence was as "powerful" as the mitigation evidence in *other* cases, but rather whether the evidence was "powerful" enough

to offset the aggravating evidence and demonstrate a reasonable probability of a different result in the *petitioner's* case.

The Supreme Court of Virginia concluded that Yarbrough's mitigation evidence was not "powerful" enough, when weighed against the State's evidence in aggravation, to demonstrate a reasonable probability of a different result. As the Court explained:

> The evidence in aggravation at Yarbrough's second penalty phase proceeding included the brutal nature of the attack on Hamby, a 77-year old man, which appeared to be an attempted decapitation. Also in aggravation was the fact that Hamby was alive when all ten of the knife wounds were inflicted on him, and that he may have lived for 15 minutes as he bled to death. The evidence also showed that Yarbrough continued to cut Hamby's neck in a sawing motion even after Hamby pleaded with Yarbrough to stop cutting him.

*Yarbrough V*, 609 S.E.2d at 39-40; *see also id.* at 32-33 (describing additional testimony from Hamby's family, friends, neighbors and customers). Weighing this evidence against the totality of Yarbrough's evidence in mitigation, the Virginia Supreme Court held that the record failed to demonstrate a reasonable probability of a different result. *Id.* at 40.

What is especially lacking from Yarbrough's claim is any evidence that attributes his crime to his suboptimal childhood. *See Wiggins*, 539 U.S. at 535 ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are *attributable* to a disadvantaged background . . . may be less culpable than defendants who have no such excuse") (emphasis added) (internal quotation marks omitted). Yarbrough's evidence establishes that he came from a disadvantaged background, but offers no support for the inference that his murder of Hamby was somehow attributable to that background. To the contrary, all those who testified about his disadvantaged background also maintained generally that he was a fundamentally decent, well-behaved child and young man.

In the absence of any extreme abuse, deprivation, or mental deficiency that would readily permit a jury to attribute Yarbrough's acts to his background, or in the absence of any expert testimony to connect Yarbrough's upbringing to the crime — a connection that Ward deliberately chose not to draw because of its double-edged nature — we cannot conclude that there was a reasonable probability that a jury would decide Yarbrough's fate differently if it heard this evidence. Indeed, it seems reasonably probable that the jury would wonder why, after so many years of being mature and responsible beyond his years to care for his mother and his sister when necessary, Yarbrough suddenly lashed out and committed such a vile act of violence against an elderly man. A jury hearing this evidence might therefore be led to find Yarbrough more culpable for his criminal acts, rather than less. *See Bowie v. Branker*, 512 F.3d 112, 121 (4th Cir. 2008); *Moody v. Polk*, 408 F.3d 141, 152 (4th Cir. 2005).

Considering the Virginia Supreme Court's weighing of the evidence and the deficiencies in the mitigation evidence available, we conclude that its decision was not an unreasonable application of federal law.

Yarbrough also takes issue with several factual findings made by the Virginia Supreme Court. But he has offered no new evidence in rebuttal. He simply contests determinations made by the Court, pointing to other portions of the evidentiary hearing transcript that, in his view, support the characterization of the facts he prefers.

The Supreme Court of Virginia's factual findings regarding the evidence in mitigation are, of course, presumptively correct. *See* 28 U.S.C. § 2254(e)(1). Moreover, they appear to us to be substantially correct, or if not correct, at least a reasonable summation of the testimony presented at the evidentiary hearing. *See id.* § 2254(d)(2).

Accordingly, we affirm the district court's judgment that the Supreme Court of Virginia did not unreasonably apply clearly established federal law in rejecting Yarbrough's claim of prejudice due to Ward's failure to present additional mitigating evidence at sentencing and that the Virginia Supreme Court's decision was not based on an unreasonable determination of the facts.

Therefore, on the two claims included within the certificate of appealability, we affirm.

*AFFIRMED*