SUTTON, Circuit Judge.
After a state court jury convicted Don Perkins of two counts of first-degree murder and imposed a life sentence, he filed a petition for a writ of habeas corpus. The district court denied the petition and granted a certificate of appealability on three issues: (1) whether the trial court impaired his right to present a complete defense; (2) whether prosecutorial misconduct violated his right to a fair trial; and (3) whether counsel provided ineffective assistance. We affirm.
*825 I.
Late in the night spanning October 15 and 16, 2001, Damon Hill, Antonio Hall and Maurice walked to the back of the residence where three men with guns surprised them. The gunmen pointed their handguns at the trio. No one moved for thirty or forty seconds. When Odums heard a gunshot, he ran through the backyard and down an alley toward an intersection, where he saw police. He ran to the police car and told the officers that “some guys was just shooting at me in the back yard.” R.ll-5 at 116.
Corey Scales emerged from the alley. The officers arrested Scales, after which they proceeded down the alley until they discovered the bodies of Hall and Hill at the driveway for 14181 Spring Garden Street. Each had suffered a single gunshot wound to the head.
When Sergeant Eric Decker arrived, he stood near the officers’ squad car, where Scales was detained in the back seat. A white Chevrolet Caprice drove by, slowing as it approached the police car. As the vehicle passed, Scales pressed his face against the squad car’s backseat window, seemingly (according to Sergeant Decker) trying to communicate to the' car’s occupants. Decker pointed his flashlight at the Caprice and ordered the driver to stop the car, but the driver kept moving.
Officers in two other cars pursued the vehicle. The car eventually slowed down and a passenger, Anthony Patton, exited. The driver, Don Perkins, stopped, and the officers arrested him. On October 16, Maurice Odums identified Don Perkins in a police lineup as one of the gunmen at 14181 Spring Garden Street.
A grand jury charged Perkins with two counts of premeditated murder, two counts of felony murder, one count of armed robbery, one count of assault with intent to commit murder, one count of being a felon in possession of a firearm, and one count of possession of a firearm during the commission of a felony. At trial Perkins denied any involvement in the murders. He testified that he had been at a wake until approximately 10:40 PM on the night of the murders. The only reason he was in the neighborhood, he said, was to pick up Lena Nixon, a woman he had been dating, at a nearby bus stop. A jury convicted Perkins on all counts and sentenced him to life in prison for the murder convictions.
The Michigan Court of Appeals affirmed his conviction, and the Michigan Supreme Court denied leave to appeal. The district court rejected his habeas petition and granted a certificate of appealability on three issues: (1) whether the trial court impaired his right to present a complete defense; (2) whether prosecutorial misconduct violated his right to a fair trial; and (8) whether counsel provided ineffective assistance.
II.
Perkins filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act. We therefore may grant the writ with respect to claims “adjudicated on the merits in State court proceedings” only if the state court adjudication “resulted in a decision that was contrary to, or involved an unreasonable application of’ clearly established Supreme Court precedent or “resulted in a decision based on an unreasonable determination of the facts.” 28 U.S.C. § 2254(d).
III.
Perkins first claims that the state trial court violated his right to present a complete defense when it refused to allow him to call the officer who took Maurice Odums’ statement on the night of the murders. After the State rested, Perkins called Sergeant Christopher Quarello to testify about a statement that Maurice *826 Odums gave to the police on the night of the murders. In the statement, Odums described Perkins as about 5'6" tall, even though he is about six feet tall. Defense counsel thought this testimony would undermine Odums’ identification.
But as it turned out, Officer Fisher, not Sergeant Quarello, had taken Odums’ statement, and Fisher was not on the witness list. When counsel realized the problem, he tried to call Officer Fisher to the stand. The court denied the request because Perkins had not put Officer Fisher on the witness list, it did not want to delay the proceedings and Fisher’s testimony would have repeated Odums’ earlier testimony. The Michigan court of appeals agreed that Perkins’ request to produce Officer Fisher would have “delayed the trial considerably” and that Officer Fisher’s testimony would have touched on matters that were “already covered in detail at trial.” R.11-13 at 3. It therefore held that the trial court did not abuse its discretion in denying Perkins’ request to produce Officer Fisher.
This decision did not unreasonably apply Supreme Court precedent. Criminal defendants enjoy a Sixth and Fourteenth Amendment right to present evidence, but that right “is subject to reasonable restrictions,” including reasonable restrictions on the admission of evidence at a trial. United States v. Scheffer, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998). So long as judges rely on evidentiary and local rules of general applicability that are not “arbitrary or disproportionate to the purposes they are designed to serve,” the judges may enforce these rules. Id. (internal quotation marks omitted). Trial judges also have “wide discretion” to refuse to admit testimony that would be “merely cumulative in nature.” United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 230, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).
Under Michigan law, criminal defendants must disclose to the prosecutor the names and addresses of all witnesses they plan to call at trial. Mich. Ct. R. 6.201(A)(1); Mich. Comp. Laws § 767.94a(l)(a). Defendants may add other witnesses during trial only with the court’s permission. M.C.R. 6.201(F), (I); M.C.L. § 767.94a(2)-(3).
Perkins wisely does not challenge the Michigan rule itself, which is neither arbitrary nor disproportionate to its purposes because, without it, no lawyer could prepare for trial. Cf. Taylor v. Illinois, 484 U.S. 400, 401-02, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Perkins instead challenges the trial court’s application of the rule. He notes that, because the prosecuting attorney removed Fisher from the witness list, “any blame for the delay should” lie with the State. Perkins Br. at 11, 12. But nothing in the record tells us who removed the Fisher from the witness list. The prosecutor acknowledged that Officer Fisher “was removed from the witness list,” R.11-8 at 8, but did not say who took him off the list. Nor did anyone else. Nor for that matter is it clear that, even if the prosecutor had initially placed Fisher on its witness list, this would alleviate defense counsel’s obligation to prepare his own accurate witness list. On this record, we cannot say that the state trial court unreasonably found that Perkins was responsible for Fisher’s absence from the list.
Even so, Perkins adds, Fisher’s testimony “went to the very heart of this case” and would have “create[d] a reasonable doubt that otherwise would not exist,” and thus any witness-list errors should have been excused. Perkins Br. at 12, 13. Yet the state courts held that this testimony was cumulative, and reasonably so. At this point in the trial, the jury had already heard from Maurice Odums about his wit *827 ness statements to police and about any inconsistencies between that testimony and his testimony in another trial. The prosecutor and Odums engaged in a long colloquy about his description of Perkins to officers, including his estimate that Perkins was “maybe six feet tall.” R.ll-5 at 119. Defense counsel then attempted to undermine Odums’ identification testimony. He asked about Odums’ prior testimony in Corey Scales’ trial, including a statement in which Odums described Perkins as “[t]he small guy,” R.ll-6 at 40, all as part of a series of questions designed to show inconsistencies between Odums’ testimony at Perkins’ trial and his testimony in Corey Scales’ trial. Although Odums never specifically said Perkins was 5'6" tall, as opposed to saying he was “[t]he small guy,” the state court’s conclusion that any inconsistencies in Odums’ testimony had “already been brought out” was a reasonable one. R.ll-8 at 10.
IV.
Perkins next claims that the state courts violated his constitutional rights, primarily it appears his rights under the Compulsory Process Clause, with respect to how they treated his efforts to call Lena Nixon as a witness. Here, too, he is mistaken.
Perkins identified Nixon as an alibi witness and sought to produce her at trial, but she managed to avoid service of a witness subpoena. In response, Perkins asked to call the process server, the individual who tried to serve the subpoena, as a witness. The trial court rejected the request because the process server could not say anything about Nixon’s testimony, only what the individual had done to try to serve her. That was a reasonable decision. The Compulsory Process Clause does not require courts to admit irrelevant evidence. Crane v. Kentucky, 476 U.S. 683, 689-90, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986). Because the process server could not have testified about what Nixon would have said, but only how he had tried to serve her, the trial court had no obligation to permit the testimony.
To the extent Perkins means to argue that the trial court refused to subpoena Nixon, that does not help him. Perkins offers no evidence that the trial court refused to issue the subpoena, and nothing in the record supports the idea. To the contrary: Perkins’ efforts to call the process server as a witness suggest that the court indeed issued a subpoena but that Nixon could not be found.
To the extent Perkins means to argue that the trial court should have offered additional assistance in locating and producing Nixon, that contention goes nowhere. The Michigan court of appeals held that, as a matter of Michigan evidence law, Perkins did not seek additional assistance until it was too late. See M.C.L. § 767.40a(5). A state court’s application of its own evidentiary rules, unless fundamentally unfair, does not violate the U.S. Constitution. Wynne v. Renico, 606 F.3d 867, 871 (6th Cir.2010). That was not the case here.
V.
Perkins complains that his counsel provided ineffective assistance by failing (1) to object to “the many instances of prosecutorial misconduct,” (2) to move to suppress the lineup in which Odums identified Perkins and (3) to present “an expert witness on the inherent problems with eyewitness testimony.” Perkins Br. at 24-25. Constitutionally ineffective assistance exists when “counsel’s performance was deficient” and the “deficient performance prejudiced the defense.” Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An attorney’s performance is constitutionally deficient when it falls “below an ob *828 jective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. Our analysis is “highly deferential” and we “indulge a strong presumption that counsel’s conduct [fell] within the wide range of reasonable professional assistance.” Id. at 689, 104 S.Ct. 2052. Deficient performance prejudices the defense when “there is a reasonable probability” that “the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. Because the Michigan court of appeals reviewed Perkins’ ineffective-assistance claim on the merits, we give the state court’s adjudication AEDPA deference. See 28 U.S.C. § 2254(d). The Supreme Court recently emphasized the double dose of deference that federal courts must give state courts in reviewing Strickland claims under AEDPA:
As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court’s ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.... An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest “intrusive post-trial inquiry” threaten the integrity of the very adversary process the right to counsel is meant to serve.... Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel’s actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland’s deferential standard.
Harrington v. Richter, — U.S.-, 131 S.Ct. 770, 786-88, 178 L.Ed.2d 624 (2011).
A.
Disparaging comments. Perkins’ main argument goes to his counsel’s failure to object to disparaging comments by the prosecutor. Two inquiries guide whether a prosecutor’s misconduct warrants a new trial and whether, for present purposes, a reasonable attorney would have objected to the conduct. One, we ask whether “the prosecutor’s conduct and remarks were improper.” Macias v. Makowski, 291 F.3d 447, 452 (6th Cir.2002). Two, if the comments were improper, we ask “(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) whether the evidence against the defendant was strong.” Id. (citing United States v. Carroll, 26 F.3d 1380, 1385 (6th Cir.1994)); see Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). At issue then is whether the prosecutor’s conduct rose to this level, whether as a result Perkins’ counsel should have objected and whether any failure to object prejudiced Perkins.
1.
Prosecutorial misconduct — opening statement. First, the prosecutor noted in his opening statement that Corey Scales’ “case has already been disposed of,” R.ll-5 at 70, a reference that became unfair, Perkins says, when the prosecutor elicited testimony from Odums that he had testified at Scales’ trial. The “clear implication” from this part of the opening statement and Odums’ testimony, as Perkins sees it, is that Odums must be a credible *829 witness because he testified at the trial of a defendant whose case had “already been disposed of.” Perkins Br. at 16.
But this argument piles one unwarranted assumption on another. Assumption one: when the prosecutor said that Scales’ case had been disposed of, he implied Scales had been convicted at his trial. Assumption two: because Maurice Odums had testified for the State in a trial where the jury convicted the defendant, Odums must be a reliable witness. Assumption three: that a jury would connect the two inferences, even though they do not specifically reference one other or for that matter say what Perkins suggests they say. Each assumption is unnecessary, and the risk that all three would be made by the jury is an attenuated one. A court can “dispose of’ a criminal defendant’s case with a conviction, an acquittal or in some circumstances a mistrial. The prosecutor’s comment in his opening statement elevates none of those meanings over the others. Odums’ statement that he testified at Scales’ trial thus tells the jury little. And the reality that the prosecutor made the two statements at different times, roughly an hour or two apart, weakens further the risk that any such inferences would be drawn. The Michigan court of appeals reasonably determined that Perkins was not prejudiced by his counsel’s failure to object.
Second, the prosecutor said in his opening statement that Maurice Odums “passed the gold standard test, going to a line-up and choosing the right man, that is Don Perkins.” R.ll-5 at 81-82. The district court acknowledged that “[t]his remark would have been better suited to closing arguments,” but that ultimately it “could not have prejudiced Petitioner, given the strength of evidence against him and the trial court’s instruction that the attorneys’ opening statements were not evidence.” R.ll-13 at 10. We agree. The remark was fleeting, relatively mild and indeed could have been made in the same trial, albeit during closing argument. At a minimum, and as the Michigan court of appeals concluded, defense counsel’s failure to object to it was not prejudicial. See Byrd v. Collins, 209 F.3d 486, 537-38 (6th Cir.2000).
2.
Cross-examination. Perkins argues that his counsel should have objected when the prosecutor asked Perkins whether he could “think of any reason” that Sergeant Decker would lie when he said he had ordered Perkins to stop his car on the night of the crime. R.ll-9 at 124. Under Michigan law, “it [is] improper for a witness to comment or provide an opinion on the credibility of another witness since matters of credibility are to be determined by the trier of fact.” People v. Buckey, 424 Mich. 1, 378 N.W.2d 432, 439-40 (1985). But the risk of prejudice here is slender. Whether Decker asked Perkins to stop was a peripheral point, and the fact that the defendant was given an opportunity to comment on Decker’s credibility holds little risk of prejudice to Perkins.
3.
Disparaging defense counsel. First, Perkins says that his counsel should have objected when the prosecutor noted in his opening statement that “maybe [defense counsel] is not thankful for” the jurors’ service, but that “we know that you made a sacrifice to be here.” R.ll-5 at 62. This kind of shameless effort to ingratiate oneself to a jury may be in bad taste and may give lawyers a bad name. But there are tactical reasons for declining to object (remaining above the fray) and a remedy to boot (disproving the suggestion by thanking the jurors in his opening statement, which defense counsel did). “[T]rial *830 counsel’s tactical decisions are particularly difficult to attack,” O’Hara v. Wigginton, 24 F.3d 823, 828 (6th Cir.1994), and choosing whether and when to object to such posturing is classically one that should not be upset by a federal court on collateral review.
Second, Perkins says that the prosecutor “implied that [defense] counsel was either a liar or incompetent by saying in front of the jury that he showed him an exhibit during lunch hour, knowing that he did not.” Perkins Br. at 17. On the third day of trial, the prosecutor represented that he had shown an exhibit to defense counsel during the lunch hour. Defense counsel responded that he “was down on the third floor during lunch hour,” suggesting he had not seen the exhibit. R.ll-9 at 182. At that point, the prosecutor showed counsel the exhibit and explained that he had shared it with him as the jury left for lunch. The record supports the prosecutor’s statements. Just before the court adjourned at mid-day, the prosecutor told the court, with defense counsel there, about the exhibit. The prosecutor at any rate did not say that defense counsel was “a liar or incompetent” but merely said (accurately) what had happened.
Third, Perkins complains about disparaging comments the prosecutor made in his rebuttal argument, namely that defense counsel “knows how to cast an aspersion on somebody,” that he was a “wolf in sheep’s clothing,” that he was “a guy who represents a criminal,” that his “character is known” and that he was paid to represent Perkins. R.11-11 at 67-70, 72, 74. The tit-for-tat gamesmanship exemplified by these comments and by the remarks of defense counsel that preceded them brings no credit to the bar and gives trial judges gray hair. But the Michigan court of appeals nevertheless reasonably concluded that defense counsel’s failure to object did not violate the Sixth Amendment.
The key problem with Perkins’ claim is that the prosecutor’s rebuttal remarks did not arise in a vacuum. Before the prosecutor gave his rebuttal argument, Perkins’ counsel engaged in borderline conduct of his own during his closing argument. Defense counsel was a former professional football player, and in his argument he recounted “the two percent” of football players who would play “the illegal game,” “[h] it you out of bounds” and otherwise play dirty. R.11-10 at 57. Just as the football arena reveals character, trying a case “demonstrates your character. Believe me,” he said, “if you want to see somebody’s character, just come to court.” R.11-10 at 57.
All of this was prelude to defense counsel’s direct and implied attacks on the character of the prosecutor and the State’s witnesses. He twice referred to the “two percent” in describing the State’s case, its lawyer and its witnesses. R. 11-11 at 63. He directly accused one police officer who had testified for the prosecution of being “a sacrificial liar” and of testifying “untruthfully.” R. 11-10 at 57. And he called another State’s witness “an angel” who “never tells a lie,” mocking the idea that he was telling the truth: “Think about those little costumes they have at Christmas time, they put wings on them, and they put that little halo thing that go around them, the white halo. That’s what we need to put on Sgt. Wilson. He never tells a lie. I’ve got some other initials I’d put for him, but I won’t say that.” R. 11-11 at 62.
Context matters. The prosecution’s rebuttal followed on the heels of the defense closing, and not surprisingly it sought to rebut the charges. The prosecutor noted that Perkins’ counsel, “through his entire comments to” the jury, “[wa]s essentially scandalizing pretty much everybody in the case,” “cast[ing] aspersions” and “at *831 tackfing] essentially everybody in th'e case.” R.ll-11 at 67-68. Only then did the prosecutor call Perkins’ counsel “the wolf in sheep’s clothing” based apparently on the soft-spoken way in which counsel delivered his criticisms of the State’s witnesses. R.ll-11 at 67. Only then did he say that defense counsel’s “character is known.” R.ll-11 at 68. And only then did he repeatedly mention that defense counsel was paid to represent Perkins. When “objectionable content was invited by or was responsive to the opening summation of the defense,” that may “not ... excuse improper comments,” but it does help “to determine their effect on the trial as a whole.” Darden, 477 U.S. at 182, 106 S.Ct. 2464. Unlike unprovoked comments, these back-and-forth remarks arose in verbal surroundings that lessened the risk of prejudice to either party.
How in this setting, moreover, would a trial court have responded to an objection by defense counsel? The two most likely possibilities are these. One is an outright overruling on the ground that what is sauce for the goose is sauce for the gander, with the trial court telling defense counsel in open court that he cannot expect to launch an aggressive attack on the character of the State’s witnesses and the prosecutor without incurring incoming fire on rebuttal. The other possibility is an admonition to the prosecution to tone it down while again reminding defense counsel that he engaged in the same kind of conduct and the prosecution is allowed to respond in kind. The risk of prejudice in these scenarios runs in the direction of Perkins if his counsel objected and away from Perkins if he does not.
The prosecutor’s remarks also were isolated. See Carroll, 26 F.3d at 1385. He made one potentially improper comment during his opening statement — the remark that Maurice Odums “passed the gold standard test” when he identified Don Perkins in a line-up, R.11-5 at 81-82 — and made a few borderline comments during his rebuttal argument, all in response to comments by defense counsel. Even when the prosecutor made these comments, context shows that they were not part of a larger, deliberative strategy to discredit defense counsel. See Carroll, 26 F.3d at 1385. They were “off-hand remark[s] in a heated trial,” triggered by defense counsel’s charges against the prosecutor and the State’s witnesses, as opposed to previously “selected] inappropriate arguments ... use[d] ... repeatedly during summation.” Bates v. Bell, 402 F.3d 635, 648 (6th Cir.2005).
The prosecutor’s comments also did not bear on the key issues in the case and had little possibility of affecting a jury verdict that rested on ample evidence. See Carroll, 26 F.3d at 1385. Maurice Odums identified Perkins as one of the assailants in a line-up within 24 hours of the crime and did the same at trial. Police found Perkins near the scene of the crime soon after the shootings. And when a police sergeant ordered him to stop his car, Perkins sped away and continued to drive after two other police cars gave chase. At trial, Perkins admitted to being near the scene of the crime and that he did not stop his car despite the officers’ pursuit. The key piece of evidence was Maurice Odums’ identification testimony. Yet the prosecutor’s alleged misconduct had nothing to do with Odums. The prosecutor’s comments did not improperly inflate Odums’ testimony, and they did not improperly diminish competing testimony. They were directed at defense counsel, who had just accused several state witnesses of lying and attacked the character of the prosecutor. The Michigan court of appeals reasonably held that failure to object in this setting does not establish a cognizable ineffective-assistance claim.
*832 4.
Unsworn Testimony. Perkins argues that the prosecutor gave unsworn testimony in his closing argument. “It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any purported facts that are not in evidence and are prejudicial.... However, prosecutors must be given leeway to argue reasonable inferences from the evidence.” Byrd, 209 F.3d at 535.
First, the prosecutor made two comments suggesting that Anthony Patton could have been the third gunman: (1) When referring to the men who ambushed Hall, Hill and Odums in the backyard of 14181 Spring Garden Street, the prosecutor said that “a third person who’s never identified” “might be Anthony Patton,” R.11-10 at 15; and (2) When referring to the same men, he said, “That’s three guys; Corey Scales, Don Perkins, the unknown person, eventually, supposedly is Mr. Patton.” R. 11-10 at 35. This was a reasonable inference to draw from the evidence. Patton’s testimony corroborated Perkins’ testimony. And when the prosecution fairly challenged the truthfulness of Perkins’ testimony, the necessary implication was that Patton had lied as well. Nor, it bears adding, did the prosecutor affirmatively declare that Patton had been the third gunman. He used qualifying language— “might be” and “supposedly”' — to draw a fair inference that the man riding along with Perkins after the shootings might be the third triggerman. It is unclear at all events how these remarks prejudiced Perkins, as he offers no theory of prejudice on this score.
Second, the prosecutor said that the backyard at 14181 Spring Garden Street was “lit up ... by a floodlight,” R.11-10 at 15-16, which allegedly was contrary to the evidence. Yet several witnesses testified about the light in the backyard. R.ll-5 at 108-09 (Odums); R.11-6 at 19-20 (Odums); R.11-6 at 82-83 (Officer William Niarhos); R.11-6 at 87 (Officer Niarhos, describing a “floodlight”); R.11-6 at 103-04 (Tiffany Hopkins). No doubt there was some testimony to the contrary, but the prosecutor (like defense counsel) may use the evidence favoring it during argument.
Third, the prosecutor said that, when Perkins drove by the squad car containing Corey Scales, it was a “classic” instance of a defendant “returning to the scene of the crime,” a statement Perkins decries because there was no foundation that those who commit crimes return shortly to the scene of the crime. R. 11-10 at 19. But this was a permissible inference to draw from the evidence, giving counsel a reasonable basis for not objecting to it.
Fourth, Perkins says that the prosecutor unconstitutionally shifted the burden of proof when he noted that Lena Nixon had not testified and had not corroborated his alibi defense. But while a prosecutor may not comment on a defendant’s silence, “a prosecutor is entitled to comment on a defendant’s failure to call witnesses to contradict the government’s case” so long as the prosecutor does not suggest that the defendant bears the burden of proof. United States v. Clark, 982 F.2d 965, 968-69 (6th Cir.1993). The prosecutor did not say or suggest that Perkins bears the burden of proof. He started his remarks by saying that, faced with the State’s evidence, “if you’re sitting with Mr. Perkins” you may want to “produce some witnesses that are going to put you somewhere else.” R.11-10 at 28. To do that, you put on “alibi witnesses.” R.11-10 at 29. But Ms. “Nixon wasn’t one of those witnesses, and that’s the first thing that I think you begin your analysis on.” R.11-10 at 29. He thus did not say that Perkins bore the burden of proving his innocence; *833 he said that the failure to produce Lena Nixon undermined his alibi.
B.
Police Lineup. Perkins says that defense counsel provided ineffective assistance when he failed to challenge the lineup in which Odums identified Perkins. Only if an “identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification” is there a cognizable challenge to a lineup. Simmons v. United States, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Perkins’ problem is that he offers no reason why his counsel underperformed in refusing to object to the lineup. He offers no evidence that the identification procedure was impermissibly suggestive. And the risk of misidentification was small in view of Odums’ testimony that he identified Perkins in the lineup because “[h]e was familiar” with him. R.11-6 at 54-55.
C.
Eyewitness Testimony. Also unavailing is Perkins’ claim that his attorney should have called an expert witness to testify about the “inherent problems with eyewitness testimony.” Perkins Br. at 25. The Constitution does not require defense counsel to pursue every trial strategy imaginable, whether likely to bear fruit or not. See Engle v. Isaac, 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). No precedent establishes that defense counsel must call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment. And there is nothing about this case suggesting that such a witness was imperative here.
VI.
For these reasons, we affirm.