RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

THOMAS E. CLARDY,

  *Petitioner-Appellee,*

  *v.*

ZAC POUNDS, Warden,

  *Respondent-Appellant.*

> No. 23-5676

─────────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:19-cv-01098—Aleta Arthur Trauger, District Judge.

Argued:  May 2, 2024

Decided and Filed:  January 27, 2025

Before:  LARSEN, READLER, and DAVIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant.  Scott D. Gallisdorfer, BASS, BERRY & SIMS, PLC, Nashville, Tennessee, for Appellee.  **ON BRIEF:**  Richard D. Douglas, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellant.  Scott D. Gallisdorfer, BASS, BERRY & SIMS, PLC, Nashville, Tennessee, Jessica M. Van Dyke, Jason M. Gichner, THE TENNESSEE INNOCENCE PROJECT, Nashville, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

LARSEN, Circuit Judge.  In 2005, a group of men shot brothers Kirk and Kent Clouatre, and Kirk's wife, Melissa, at Kent's auto-repair shop.  Kirk died; Kent and Melissa survived. Kent identified one of the shooters as Thomas Clardy.  Clardy was charged with murder,

attempted murder, and reckless endangerment.  At trial in state court, Kent's identification of Clardy was the primary evidence connecting Clardy to the shooting.  Clardy's counsel highlighted the problems with that identification, but she did not call an expert on eyewitness identification because she could not find one willing to work for what Clardy could afford or what she understood the state would pay.  Clardy was convicted, and the conviction was affirmed.  Clardy then filed a petition for postconviction review in state court where he argued, among other things, that his trial counsel was ineffective for failing to call an eyewitness expert.  The state trial court denied that petition and the court of appeals affirmed.  The state courts did not decide whether Clardy's counsel had performed deficiently but concluded that Clardy had suffered no prejudice.  Clardy then filed a petition for writ of habeas corpus in federal court.  The district court granted the writ on the eyewitness-expert claim, concluding that counsel had performed deficiently and that the state court had unreasonably applied clearly established Supreme Court precedent in concluding that Clardy was not prejudiced.  We REVERSE and REMAND because counsel's performance was not deficient.

I.

A.

On July 29, 2005, brothers Kirk and Kent Clouatre were at Kent's auto-repair shop in Madison, Tennessee.  *State v. Clardy*, No. M2007-02729-CCA-R3-CD, 2009 WL 230245, at *1 (Tenn. Crim. App. Feb. 2, 2009).  That evening, Kirk told Kent that "somebody was coming" to the shop to look at a black Monte Carlo that Kirk was selling.  *Id.* at *4.  Between 9:30 and 10:00 pm, Kirk called his wife, Melissa Clouatre, to pick him up.  Melissa loaded her two daughters and one of her daughter's friends into her car and drove to the shop.  There, Kirk noticed a problem with Melissa's car, so he pulled the vehicle into the shop to complete a quick repair.

While Kirk began the repair, Kent was gathering trash outside of the shop.  Kent saw three men pull up to the shop in a "forest green [Ford] Taurus."  *Id.* at *5.  The men rolled down the window and asked Kent whether the Monte Carlo was still in the shop.  Kent did not recognize the men immediately but told them the car was in the garage and "hollered" at his brother to inform him of their arrival.  *Id.* at *4.

Kent saw three men wearing hooded sweatshirts exit the vehicle and walk into the shop. As the men began to speak with Kirk, Kent saw the driver's face from the side and recognized him as somebody that Kirk knew. Kent knew the man only as "T." Kent knew that T owned a burgundy Monte Carlo and had previously spoken with him about a black paint job for it. The men spoke to Kirk until Kirk turned and walked away from them to continue his work on Melissa's car. Then the shooting started.

Kent saw T shoot Kirk. "[W]hen the two shots went off, [T] turned to the side and [Kent] [saw] the side of his face." *Id.* at *5. That left Kent with "no doubt in his mind" that T was the shooter. *Id.* A different man then shot Kent. Melissa, standing apart from the men, also saw a gunman shoot Kirk; the same gunman then shot Melissa. She did not get a good look at the shooter, who was approximately thirty feet away, but she did not think that she had ever seen him before. The men returned to the car and fled. Melissa went into the shop's office to call 911. Kent hid behind a telephone pole until the men left, calling two friends and his fiancée "to find out if somebody was in the area that could catch these individuals." *Id.*

Kirk died before law enforcement reached the scene. When police and paramedics arrived, Kent told a police officer "it was a guy named T." *Id.* Officer Bridget Ann Griepentrop, the first officer on the scene, did not hear Kent identify T but testified that Kent told her the shooters drove a blue Buick. Officer Griepentrop testified that Melissa identified the shooter as "a male black, approximately 5'8[”], 140 [pounds] with [a] white shirt and a[n] . . . afro." *Id.* at *6. Melissa would later testify, however, that she did not recall making any statements to the police or paramedics at the scene. Paramedics quickly took Kent and Melissa to the hospital.

Kent repeatedly identified T as his brother's shooter in police interviews following the incident. Detective Cynthia Quirouette interviewed Kent the day after the shooting, while he was still unable to speak, but could write. When she asked Kent who the shooters were, Kent wrote: "somebody that might know the guy T" and that "[T] was there." *Id.* at *9. In an interview the next day, Kent described T "as 5'5" to 5'7", 150-60 pounds, 25 to 28 years old with permed hair." R. 10-3, PageID 1291. One week after the shooting, Kent described T "as 5'4" to 5'5", 150 to 200 pounds, between 28 to 30 years old with permed greasy hair, a short flattened out nose and crooked top front teeth." *Clardy*, 2009 WL 230245, at *9. After he was

discharged from the hospital, Kent told Detective Danny Satterfield and Sergeant Detective John Batty that T was the driver of the vehicle and the gunman who shot Kirk.  According to the detectives' report summarizing the interview, Kent described T as "five foot six inches, 170 pounds, hair in small braids, tattoos." *Id.* at *6.  When Satterfield showed Kent a photo lineup, Kent identified Clardy as T.

Melissa also provided descriptions of the gunmen.  On the night of the shooting, Detective Jason Proctor interviewed Melissa at the hospital.  Melissa described the man who shot her as five-foot-seven, one-hundred-seventy pounds, in his late twenties or early thirties, with "frizzy hair," wearing a "white t-shirt." *Id.* at *7.  Melissa described the shooters' vehicle as a "90's four-door blue car, possibly a Taurus." *Id.*  Two days after the shooting, Melissa described three suspects to Detective Quirouette.  Melissa gave slightly different descriptions, describing the man who shot both her and Kirk as five-foot-six to five-foot-seven, one-hundred-seventy pounds, with fluffy hair and a gray and white t-shirt.  Quirouette testified that Melissa also said the man who shot her wore something white on his head.  One week after the shooting, Melissa again told Quirouette that the man who shot her was wearing a white shirt and had an afro.  She repeated her statement that the "suspects were driving a blue four-door car with an oval back" that looked like a "'96 to '97 Sab[le] or Taurus." R. 10-3, PageID 1263.  Melissa was never able to identify any of the shooters in a photo lineup.

Several weeks after the incident, Detective Quirouette interviewed Quinton, one of the friends Kent had called immediately after the shooting.  On that call, Kent told Quinton that T had shot his brother.  Quinton passed away after his interview with Quirouette, before the trial.  Quirouette also interviewed another friend of Kirk and Kent's, Roselle Wester.  Wester testified that he recognized Clardy as T from the neighborhood.  He had seen Clardy come around Kent's shop a few times driving a "green Taurus or Sable."[1]  R. 10-2, PageID 1148.  Wester said that Kirk and Clardy did not get along and that there had been several "[c]onfrontations" or

---

[1]Mercury, a Ford brand, produced the Sable as a luxury trim of the Ford Taurus.  John Holusha, *Ford Puts Its Future on the Line*, N.Y. TIMES (Dec. 1, 1985), https://www.nytimes.com/1985/12/01/magazine/ford-puts-its-future-on-the-line.html.  The two vehicles are "very similar in appearance." *Clardy v. Boyd*, No. 3:19-cv-01098, 2023 WL 2287640, at *5 (M.D. Tenn. Feb. 28, 2023) (Magistrate Judge Report and Recommendation).

"arguments" between the two. *Id.* at 1147. A couple of weeks before the shooting, Kirk told Clardy to leave the shop and never return.

Sergeant Detective John Batty subsequently visited Clardy's apartment. Though Clardy was absent, Batty saw a "teal green" "[19]96 Mercury Sable" parked outside. R. 10-3, PageID 1233. When Clardy later turned himself in to police custody, his arrest report recorded that he was five-foot-eight and one-hundred-seventy pounds. Clardy was indicted on six counts: one count of first-degree premeditated murder, two counts of attempted first-degree premeditated murder, and three counts of reckless endangerment.

At trial, Clardy's counsel, Patricia Snyder, focused her cross-examinations on inconsistencies relating to Kent's identification of the gunmen and the vehicle they drove. Snyder asked Kent why he did not immediately identify the shooter as T to the first police officer on the scene, Officer Griepentrop. Kent replied that he had identified T to first responders while he lay in an ambulance facing a female officer. Yet, when Snyder cross-examined Griepentrop, she said that Kent had been unable to provide any description of the suspects at the scene and denied hearing Kent make any reference to T that evening. On redirect, Griepentrop acknowledged that Kent may have identified T to another officer. Snyder asked Kent if he recalled telling Detective Quirouette that he did not see T at the shooting during his interview two days after the incident. Kent said he did not recall making any such statement. Yet in response to questioning by Snyder, Quirouette said that "at one point [Kent] said that one of the guys in the front seat of the Buick was T and at another point in the interview he said he did not see T." *Clardy*, 2009 WL 230245, at *9. Quirouette also testified that during one of Kent's interviews, Kent said that "he did not actually see [T], but he heard one of the men say 'let's go T, let's go.'" *Id.* Snyder asked Kent if he had initially described the shooters' vehicle as a "'87 Buick [Century]" to police. *Id.* at *6. Kent denied any memory of mentioning a Buick, recalling describing the car as a Taurus instead. Yet, in response to Snyder's questions, Officer Griepentrop, Detective Quirouette, and Detective Satterfield each said they recalled Kent describing the vehicle as a Buick during their interviews. Finally, Snyder asked Kent if he had described T as having tattoos. Kent said that he did not remember ever saying that T had tattoos

and that he had no idea how a reference to tattoos ended up in police reports. Yet Detective Satterfield testified that Kent described T as having tattoos.

Clardy called his wife, Rolesha, to testify. Rolesha testified that she and Clardy had two cars, a gold 2004 Dodge Stratus and a green 1996 Mercury Sable. But the "head gasket was blown" on the Sable, so it was undrivable. *Id.* at \*10. She also said that Clardy had no tattoos. The evening of the shooting, a friend of hers, Shakisha Thompson, had picked up Rolesha's son to take him bowling at around 7:30 or 8:00 p.m. and returned around 11:00 or 11:30 p.m.

Thompson was Clardy's final witness. She confirmed that she had picked up Rolesha's son between 7:30 and 7:45 p.m. and dropped him off between 10:30 and 11:00 p.m. Both times, Clardy had met her at the door. When she dropped off Rolesha's son, Clardy seemed normal and was wearing "a shirt, shorts, and 'grandpa slippers.'" *Id.* Thompson testified that she knew that Clardy's Sable had broken down and that, since then, he had been driving the Stratus. Clardy did not testify.

In closing argument, Clardy's counsel, Snyder, highlighted the inconsistencies in the testimony. She pointed out that Melissa testified to seeing a blue or green Taurus or Sable; but Kent had, at times, told officers that he had seen a gray Buick Century. She emphasized that Kent owned an auto-repair shop—"he's a car man, Kent's a car man, he ought to know what kind of car he saw." R. 10-3, PageID 1341. She claimed that Melissa saw four suspects; Kent saw three. Melissa said that the man who shot her and Kirk wore a t-shirt; Kent said he wore a hoodie. Kent at times said that T had tattoos; Clardy has no tattoos. Snyder reiterated that Kent had been shot and was in such a state that the responding officers did not think he would survive. His ability to perceive would likely have been impaired. She also suggested that Kent knew Clardy generally from the neighborhood and that there might have been reasons he would misidentify him. She concluded by reminding the jury of Clardy's alibi and that his Sable was not operational.

B.

The jury convicted Clardy on all counts. His conviction was affirmed, *State v. Clardy*, 2009 WL 230245 (Tenn. Crim. App. Feb. 2, 2009), and the Tennessee Supreme Court denied

review, *State v. Clardy*, No. M2007-02729-SC-R11-CD (Tenn. June 15, 2009), https://www.tncourts.gov/sites/default/files/certlist20090615.pdf. Clardy then filed a petition for postconviction review in state court raising several claims. Relevant here, he claimed that his trial counsel had been constitutionally ineffective for failing to call an expert on eyewitness identification.

Snyder, who was retained trial counsel, testified at the postconviction hearing. She said that she wanted to hire an eyewitness expert, but Clardy could not afford one, and counsel could not find an expert "who would be willing to take the state fees if [she] got [Clardy] declared indigent." R. 10-18, PageID 2205. She spoke with one of Clardy's relatives who she thought might pay for an expert, but that did not materialize. She drove an expert to the airport after a seminar in an effort to convince the expert to take the case, but that did not work out. She obtained a list of experts from the Tennessee Association of Criminal Defense Lawyers and "called everybody on that list" to no avail. *Id.* at 2206. She looked inside and outside Tennessee but could not find an expert who would work for what "the State of Tennessee was paying." *Id.* Counsel also said that, at that time, the Tennessee Administrative Office of the Courts "was not paying expert witness's fees that were being billed." *Id.* at 2204–05. So, in addition to Clardy's inability to afford an expert, and experts being unwilling to work for what Tennessee would pay if Clardy were declared indigent, counsel could not find an expert who would accept the state's promise of fee payment.

After the fact, counsel felt that she "apparently should have gotten an expert witness," but at the time, she "decided to go ahead with [trial]." *Id.* at 2205. She made that decision without filing a motion for expert funding because she "wanted to find [an expert] first." *Id.* at 2206.

Dr. Jeffrey Neuschatz, a psychologist and an expert on eyewitness identification, also testified at the postconviction hearing. He described several problems with eyewitness identifications. As examples, he discussed: weapon focus, which means that the presence of a weapon draws attention away from the rest of the scene, making it more difficult to remember other facts; cross-race effect, which means that it is more difficult to identify people of another race; and unconscious transference, which means associating someone around the scene with the

crime.  As an expert witness, though, Dr. Neuschatz was unable to offer an opinion as to whether Kent's identification of Clardy was correct.

The state court denied Clardy's postconviction petition.  His appeal from that denial was unsuccessful, *Clardy v. State*, No. M2017-01193-CCA-R3-PC, 2018 WL 5046032 (Tenn. Crim. App. Oct. 17, 2018), and the Tennessee Supreme Court denied review, *Clardy v. State*, M2017-01193-SC-R11-PC    (Tenn.    Apr.    12,    2019)    https://www.tncourts.gov/sites/ default/files/discretionary_appeals_list_2018apr15.pdf.

The decision affirming the denial of the state postconviction petition is the last reasoned opinion addressing Clardy's ineffective assistance claim.  *Clardy*, 2018 WL 5046032, at \*6–7; *see Wilson v. Sellers*, 584 U.S. 122, 125 (2018).   In that opinion, the Tennessee Court of Criminal Appeals (TCCA) first cited *Strickland v. Washington*, 466 U.S. 688 (1984), for the two-prong ineffective-assistance-of-counsel standard: "a petitioner must prove that counsel's performance was deficient and that the deficiency prejudiced the defense."  *Clardy*, 2018 WL 5046032, at \*2.  It then recounted counsel's efforts to secure an expert and Dr. Neuschatz's testimony at the postconviction hearing.  *Id.* at \*6–7.  Finally, it concluded that Clardy had not suffered prejudice because Dr. Neuschatz "could not opine as to the correctness of Kent's identification," and "[m]erely giving a jury more information to consider without negating the identification does not establish a reasonable probability, sufficient to undermine the outcome, that the results of the proceeding would have been different."  *Id.* at \*7.  The TCCA did not evaluate counsel's performance, expressly relying on *Strickland*'s prejudice prong, instead.

Clardy then filed a habeas petition in federal court raising several ineffective-assistance-of-counsel claims and asserting actual innocence. *See Clardy*, 2023 WL 2287640, at \*5.  A federal court's review of a habeas petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2241, *et seq.*  Under AEDPA, a federal court cannot grant habeas relief to a state prisoner on the basis of a claim adjudicated on the merits in state court unless the adjudication resulted in a decision:  (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented" in state court.  *Id.* § 2254(d).  However, when the

claim is ineffective assistance of counsel, and a state court expressly addresses only one of the two *Strickland* prongs, we review the other prong de novo. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012).

The district court first noted that, in resolving Clardy's eyewitness-expert claim, the TCCA had addressed only *Strickland*'s prejudice prong, so de novo review applied to the performance prong. *Clardy v. Pounds*, 680 F. Supp. 3d 872, 877–78 (M.D. Tenn. 2023). The district court then held, on de novo review, that trial counsel had performed deficiently. *Id.* at 880. The court concluded that counsel had "failed to make the necessary efforts to procure [expert] testimony, including by seeking funding and, if necessary, postponing the trial to give her more time to procure both an expert and the necessary funding." *Id.* The district court next acknowledged that AEDPA deference applied to the prejudice prong but found that deference overcome because the TCCA's decision involved an unreasonable application of *Strickland*. *Id.* at 883. The district court said that the TCCA "appeared to interpret 'prejudice' to require that the proposed expert testimony affirmatively negate evidence already in the record, and it unreasonably concluded that simply giving the jury 'more information to consider,' without negating the existing evidence, could never change a jury's verdict." *Id.* Clardy suffered prejudice because "no matter what efforts trial counsel exerted in trying to impeach [Kent's] identification through other means, only an expert's testimony could show that 'the eyewitness testimony was sufficiently unreliable in ways not readily apparent to a lay jury.'" *Id.* at 885 (citation omitted).

The district court granted the writ on the eyewitness-expert claim.[2] The state appeals.

## II.

A petitioner bringing an ineffective-assistance-of-counsel claim must first show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. If a petitioner meets that burden, he must then show that counsel's deficient performance caused him prejudice. *Id.*

---

[2]The district court did not address Clardy's other claims.

At the performance prong, the district court concluded that Clardy's counsel performed deficiently by failing to procure and present an eyewitness identification expert. Because the state courts did not consider that question, federal court review is de novo. *Rayner*, 685 F.3d at 638. And, in a habeas appeal, we review the district court's legal conclusions de novo and its factual findings for clear error. *Hanna v. Ishee*, 694 F.3d 596, 605 (6th Cir. 2012).

Clardy's argument proceeds in two steps. First, he argues that an expert was needed in his case. Next, he argues that counsel performed unreasonably by failing to file a motion seeking expert funding.

We begin by noting that defense counsel is not always required to "call an expert witness about the problems with eyewitness testimony in identification cases or risk falling below the minimum requirements of the Sixth Amendment." *Perkins v. McKee*, 411 F. App'x 822, 833 (6th Cir. 2011). Counsel, of course, must make reasonable professional efforts to expose weaknesses in eyewitness identifications that are central to the government's case. *Jackson v. Bradshaw*, 681 F.3d 753, 762–63 (6th Cir. 2012). But counsel need not invariably use an expert witness to do that; instead, counsel may use "other means" such as cross-examination, so long as the attorney's performance is reasonable under the circumstances. *Id.* at 763. When reviewing the adequacy of counsel's performance, the Supreme Court has "often explained that strategic decisions—including whether to hire an expert—are entitled to a 'strong presumption' of reasonableness." *Dunn v. Reeves*, 594 U.S. 731, 739 (2021) (per curiam) (citation omitted).

*Jackson v. Bradshaw* illustrates the point. There, a habeas petitioner argued that trial counsel had been ineffective for failing to secure an eyewitness identification expert because, in his view, the identification was "essential" to the case. 681 F.3d at 762. The eyewitnesses in *Jackson* had observed the events while intoxicated, the identification was cross-racial, and the eyewitnesses had been exposed to outside information that might have influenced their identification testimony. *Id.* This court noted 'the dangers inherent in eyewitness identification,'" and acknowledged that expert testimony on the subject is generally admissible. *Id.* Even so, we concluded that defense counsel's failure to seek an expert on eyewitness testimony did not amount to deficient performance. Instead, we held that counsel had performed reasonably by "emphasiz[ing] the potential weaknesses" in the identifications using

"cross-examination" and "argument." *Id.* at 762–63; *see also Dorch v. Smith*, 105 F. App'x 650, 653, 656–57 (6th Cir. 2004); *Moore v. Hardee*, 723 F.3d 488, 490–98 (4th Cir. 2013).

Even if expert testimony is not required in every case, Clardy argues that it was required in his. He relies upon two out-of-circuit cases to support this claim: *United States v. Nolan*, 956 F.3d 71 (2d Cir. 2020), and *Jones v. United States*, 262 A.3d 1114 (D.C. 2021). In *Nolan*, perpetrators wearing disguises burst into the victims' home wielding weapons and pistol-whipped one victim into unconsciousness. 956 F.3d at 76, 80. The victims were unable to give investigators a detailed description of the perpetrators for more than a month after the crime and the police engaged in the "highly irregular procedure[]" of permitting the witnesses to discuss the identification among themselves. *Id.* at 80–81. Nolan's counsel did not call or consult an eyewitness expert. *Id.* at 81. The court concluded that an eyewitness expert was required to adequately expose the weaknesses in the eyewitness identifications. *Id.* at 82. In *Jones*, the victim awoke to find an unknown woman standing next to his bed; the woman demanded money and then hit him over the head with a hard object in a sock. 262 A.3d at 1118–20. The victim was unable to identify the defendant in a photo lineup and first identified the defendant at trial. *Id.* at 1119. The victim's neighbor and landlord, who had entered the victim's home out of concern, also identified the defendant at trial and claimed that she had pointed a shiny object at him when she encountered him inside the front door. *Id.* at 1119–20. Jones' counsel did not consider consulting an eyewitness expert. *Id.* at 1121. The court once again concluded that an eyewitness expert was required. *Id.* at 1126.

The parties dispute whether *Nolan* and *Jones* are distinguishable from the instant case. We need not resolve this dispute because, even if an expert should have been called, the question is whether counsel is to blame for not calling one. Counsel's performance must be measured against an "objective standard of reasonableness" as defined by "prevailing professional norms." *Strickland*, 466 U.S. at 688. This standard does not require success in every effort, particularly in the face of limited resources. *See Yarbrough v. Johnson*, 520 F.3d 329, 338 (4th Cir. 2008) (noting that the standards of adequate performance concerning the retention of experts necessarily depend on the level of funding available); *Harrington v. Richter*, 562 U.S. 86, 107 (2011) ("Counsel was entitled to formulate a strategy that was reasonable at the time and to

balance limited resources in accord with effective trial tactics and strategies."). The Sixth Amendment does not impose a duty on counsel to secure an expert witness where no willing expert can be found. *See United States v. Stegawski*, 687 F. App'x 509, 513–14 (6th Cir. 2017) (finding adequate performance where counsel tried but could not find an expert willing to testify); *Flick v. Warren*, 465 F. App'x 461, 464–65 (6th Cir. 2012); (finding adequate performance where counsel ended efforts to call an expert after repeated refusals); *Keigley v. Rewerts*, No. 22-1924, 2023 WL 3294542, at *3 (6th Cir. Mar. 6, 2023) (order) ("It is not deficient performance for an attorney to decide not to call an expert witness if he is unable to find one willing to challenge the prosecution's theory of the case.").

Unlike counsel in *Nolan* and *Jones*, Clardy's counsel tried to hire an eyewitness expert but was unable to do so for reasons beyond her control. *Clardy*, 680 F.Supp.3d at 880. She tried to get one of Clardy's relatives to finance an expert. R. 10-18, PageID 2204. She drove an expert to the airport after a seminar in an attempt to convince the expert to take the case. *Id.* at 2205. She obtained a list of experts from the Tennessee Association of Criminal Defense Lawyers and "called everybody on that list." *Id.* at 2206. She "even went out of state to try to find somebody." *Id.* She simply could not find an expert who would work for what "[Clardy] could afford" or "what the State of Tennessee was paying." *Id.* And some of the experts she consulted would not even take appointed cases due to funding issues with the State of Tennessee. The lack of expert funding in Tennessee is not attributable to counsel and did not render her performance deficient. *See Stegawski*, 687 F. App'x at 513–14.

Clardy argues that counsel's failure to hire an expert was based on her mere "speculat[ion]" about the availability of funds, Appellee Br. at 25, and that *Hinton v. Alabama*, 571 U.S. 263 (2014) (per curiam), establishes that counsel behaved unreasonably by not filing a motion seeking funding. But *Hinton* does not govern this case. There, counsel mistakenly believed that state law capped expert funding at $1,000. In truth, the legislature had removed the cap, leaving the trial court free to authorize expert funding for "any expenses reasonably incurred." *Id.* at 267. The Supreme Court found counsel's performance deficient for not seeking funding in an amount that would have secured the services of a better expert, but the Court made

clear that "the only inadequate assistance of counsel [there] was [counsel's] inexcusable mistake of law." *Id.* at 275.

Clardy has shown no similar legal mistake on Snyder's part.  Snyder explained that she did not file a motion for expert funding because she "wanted to find [an expert] first."  R. 10-18, PageID 2206.  That hesitation seems to have been required by Tennessee's rules of procedure.  As Clardy himself acknowledges, those rules "require[] a party seeking funding for an expert witness to identify the expert by name in the motion and specify the proposed hourly rate."  Appellee Br. at 35 (citing Tenn. Sup. Ct. R. 13 § 5(b)(2)(B)).[3]  Clardy points to nothing in the record suggesting that counsel committed legal error by not filing a motion before she found a willing expert.

Snyder testified about her efforts to find a willing expert.  She explained that she sought, but could not find, an expert willing to work for what the State would pay and who would accept the State's promise of payment.  Clardy discounts this testimony.  Noting that Snyder "never said what hourly rate the experts with whom she spoke were willing to accept," Appellee Br. at 37, Clardy asks us to assume that Snyder must have been just guessing (and wrong) about what Tennessee would pay.  Clardy claims that without "filing a motion for funding with the court," Snyder could not have "reach[ed] an informed conclusion about whether adequate funding was available."  *Id.* at 30.  But one need only look at the Tennessee rules in effect at the time to see that they capped expert fees according to a fee schedule, providing a maximum hourly rate of $150 for psychologists.  Tenn. S. Ct. Rule 13 § 5 (d)(1) (2023); *see also Dotson v. State*, 673 S.W.3d 204, 212 (Tenn. 2023) (reducing an hourly rate request to comply with Rule 13's

---

[3]Clardy contends that the state has forfeited any arguments based on Rule 13's motion-filing prerequisites, Tenn. Sup. Ct. R. 13 § 5(b)(2)(B) (2023), claiming that the state failed to timely identify this subsection of the rule below.  That is wrong for a few reasons.  First, the issue of deficient performance is properly before this court because "the district court decided that issue on the merits." *Owens v. Parris*, 932 F.3d 456, 458 (6th Cir. 2019).  Next, both parties briefed the question of Rule 13 § 5(b)(2)(B)'s effect on the reasonableness of counsel's performance to the district court.  Without addressing this subsection of the rule, the district court held that counsel behaved unreasonably in not filing a fee motion because "nothing but counsel's speculation suggests that such a motion would not have been approved." *Clardy*, 680 F. Supp. 3d at 881.  It should go without saying that the State is entitled to respond to that reasoning by pointing to arguments raised, but unaddressed, in the district court, providing non-speculative reasons for counsel's behavior.

rate schedule).**4** The text of the rule provides no mechanism to request hourly rates in excess of that schedule. *See id.*

It is true that the record does not reveal the precise rate Snyder discussed with potential experts; Clardy never asked her that question. But we cannot presume from the record's silence that Snyder was *wrong* about how much Tennessee would pay. That would turn *Strickland*'s "presumption of effectiveness on its head." *Burt v. Titlow*, 571 U.S. 12, 23 (2013). The Supreme Court frequently reminds us that counsel must be "'strongly presumed to have rendered adequate assistance and [to have] made all significant decisions in the exercise of reasonable professional judgment.'" *Id.* at 22 (quoting *Strickland*, 466 U.S. at 690). "[T]he burden to 'show'" otherwise "rests squarely on" Clardy. *Id.* at 22–23 (quoting *Strickland*, 466 U.S. at 687). Nothing in the record shows that counsel misunderstood what Tennessee would pay or the way expert fees were being handled on the ground. And "[i]t should go without saying that the *absence* of evidence cannot overcome the 'strong presumption'" that counsel performed reasonably. *Id.* at 23 (quoting *Strickland*, 466 U.S. at 689) (emphasis added); *Dunn*, 594 U.S. at 739.

Clardy has made no showing that his counsel was wrong to wait to file a motion until she had a willing expert, or that she was mistaken about the amount Tennessee would pay, or the way expert fees were being handled by the state courts. So he has not shown that counsel performed unreasonably by failing to file a motion for expert fees without a willing expert.

Clardy contends that counsel still should have "requested adequate funding for at least one of the many experts with whom she described speaking, even if she suspected that the court would have denied the request." Appellee Br. at 36–37 (emphasis omitted). But "[i]t simply is

---

**4**As with the portion of Rule 13 related to motion-filing prerequisites, Clardy says that we may not refer to Rule 13's fee cap because the State did not timely raise it below. But the district court relied on one portion of Rule 13, "provid[ing] for the payment or reimbursement of reasonable and necessary expenses," Tenn. S. Ct. Rule 13 § 5(a)(1) (2023), to conclude that counsel should have filed a motion because "nothing but counsel's speculation suggests that such a motion would not have been approved." *Clardy*, 680 F. Supp. 3d at 881. This court is not forbidden from reading the whole of Rule 13, to notice that those fees "shall not exceed the [listed] maximum hourly rates." Tenn. S. Ct. Rule 13 § 5 (d)(1) (2023). *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); *Bay Mills Indian Cmty. v. Whitmer*, 794 F. App'x. 485, 488 (6th Cir. 2019) ("[I]t was improper for the parties to attempt to artificially constrain our ability to read the statute as a whole.").

not the case that a lawyer who fails to request funds that are not available, or to which his [or her] client is not entitled under governing local law, has rendered ineffective assistance of counsel." *Yarbrough*, 520 F.3d at 339; *see also United States v. Hanley*, 906 F.2d 1116, 1121 (6th Cir. 1990) (denying an ineffective assistance of counsel claim based on "motions that would likely have been futile").

After making reasonable efforts to secure an expert—and failing through no fault of her own—Clardy's counsel deployed the traditional tools of argument and cross-examination to highlight the vulnerabilities in the eyewitness identification in this case. She emphasized the discrepancies between Kent's testimony at trial and what he said to officers and detectives shortly after the shooting. She elicited testimony from Melissa and various officers and detectives that conflicted with Kent's. She showed that Clardy had no tattoos and that his fingerprints were not found at the scene. She presented testimony that Clardy's Mercury Sable was undrivable and presented an alibi witness. In closing argument, she reiterated Clardy's alibi; showed that Kent and Melissa disagreed with each other, and across time, about the car, the number of men, what the men were wearing, and what the men looked like; and made arguments about the potential reasons for the unreliability of Kent's identification. Yet, despite these efforts, the jury found the evidence sufficient to convict.

The only question before this court is whether counsel's efforts were sufficient to show that she provided "reasonably effective assistance." *Strickland*, 466 U.S. at 687. Here, counsel's diligent effort to find an expert, and, when that failed, her thorough use of argument and cross-examination were enough to satisfy *Strickland*'s performance prong. *See Jackson*, 681 F.3d at 762–63; *Moore*, 723 F.3d at 498. The district court erred by granting the writ because counsel's performance was not deficient.

* * *

We REVERSE and REMAND.